The defendants, Sam Wallace and Lula Wallace, were indicted for the larceny of $1,650 in money, the property of the Southern Express Company, a corporation, and were tried together. (624)
After hearing the evidence, his Honor charged the jury that there was insufficient evidence to pass upon the guilt of Lula Wallace, and instructed the jury to return a verdict of "not guilty" as to her.
The State introduced evidence that a package containing $1,650, which was being shipped by the Southern Express Company from the Treasury Department at Washington, D.C., to the First National Bank of Shelby, N.C. was lost on 27 May, 1912, in the city of Charlotte. this was what was called by Miss. Martin, a witness for the State, who held a position in the Treasury Department at Washington, "fit money," that is, money fit to go back into circulation, this witness testifying that on 23 May, 1912, she approved a package of money, $1,650, fifty 20's and sixty-five 10's, the First National Bank notes of Shelby, this money having been once put in circulation and having gone back into the Treasury Department and rendered again fit for circulation. The witness testified that she placed this money in a particular kind of envelope and sealed it, the same kind of package which was introduced in evidence, and that the money in the package was of the same class and character of the bill introduced and marked "Exhibit A."
William Marsh testified that he was night money clerk; that his records show that he received a package containing $1,650, which was being shipped to the First National Bank of Shelby, N.C. that this *Page 516 
package was the one that was lost; that he got the package from the express messenger on train No. 35, the train which came from Washington to Charlotte; that he received the package on Saturday night, 25 May, at 7:15 o'clock, when he turned it over to J. H. Massey, the day money clerk.
J. H. Massey, the day money clerk, testified that he remembered receiving the package from Marsh on the morning of 27 May, and that his records also show an entry of receipt of this package, which entry he made himself; Marsh took the packages from the safe that morning just before he turned them over to him; that he receipted for (625) them and placed them in his safe, and about 9 or 10 o'clock Mr. E. W. Plexico, the transfer clerk, whose business it was to transfer the money to the Seaboard station, came, and he turned the packages over to Plexico; he gave it to Plexico and Plexico took it and carried it towards his safe; that Plexico walked around the radiator to the door.
E. W. Plexico testified that he was transfer clerk; that he received a sealed package of money, $1,650, from Washington to the First National Bank of Shelby; that he was just inside of Mr. Massey's office when he received it; that when he got the packages he went to the safe with them and dropped the packages down into the safe that Sam Wallace, the defendant, was standing behind him, waiting to get the packages to take them to the wagon; that he dropped the packages into the safe and then locked it and stepped inside the room; that after the safe was locked, which was a portable safe, Sam Wallace, the defendant, was told to get it, and defendant carried the safe to the wagon, and Van Grier drove the wagon to the Seaboard depot; that when the witness got to the Seaboard depot, the train from Rutherfordton came in; he opened the safe, took out the contents and put them in his book, and had the driver, Van Grier, to drive him across to the car; the defendant, Sam Wallace, was standing near the car door, and witness stepped right out of the truck into the car door; that the witness then gave the messenger on the Seaboard train his book to sign for, and he found that the package of money was gone; that the witness looked in the car, went back to his safe, and also followed over the route to see if he had dropped it; he didn't find it, and has never found it.
Mamie Crawford testified that on 8 August, 1912, she saw Sam Wallace at the house of a woman named Rose Chestnut, and asked Sam for a nickel for street car fare; that Sam Wallace gave her a $20 bill and told her to get it changed and she could have the nickel; that she took it to Beulah Carpenter, who was on her way uptown, and asked her to get it changed; that Beulah came from uptown and gave her the *Page 517 
changed, and then they took it up to the house where Sam Wallace was; Beulah went with her to where Sam Wallace was, and told (626) Sam that she got the money changed uptown at the express office; that the man questioned her about it and looked like he didn't want to give her the change; Sam asked her what they said, and she said they asked her where she got this money; Sam said: "Why didn't you tell him that your husband give it to you?" That nothing more was said until some one said, "Here comes the expressman and the police"; that Sam further cautioned her, "If they ask you where you got this money, tell them that your husband gave it to you." Beulah said, "I can't tell them that, because I haven't got no husband." Sam got up and went out of the room, and didn't come back while witness was there.
Beulah Carpenter saw the witness, Mamie Crawford, on 8 August, 1912, receive the $20 bill which she had changed at the Southern Express office. This was the bill which was identified by John W. Hatley as the bill that he changed; the witness said that the man at the express office asked her where she got the bill, and she told him that a man gave it to her. She also testified that she "came about getting into trouble about it," and Sam asked her why she didn't say that her husband gave it to her; that two men came down the railroad, and that Sam went out the door, and afterwards she didn't see him until the trial at the recorder's court.
Beulah Pressly testified that she was at the same place, and corroborated Beulah as to what Sam said, and further stated that some one said, "The police is coming," and Sam went out the door.
William Young testified that he was at Rose Chestnut's house on the same day that Sam was there; that a girl asked Sam for a nickel; that he went out on the porch and took the money out and went in the house; that there were three $20 bills, he took one of them off and gave it to the girl; that he, the witness, was in the yard when the girl got back with the change; he saw Sam leaving the house, going a trot; that at that time the policeman was coming in at the back.
Tom Brown, a colored porter who is running on the Southern (627) Railroad, about 1 August, 1912, said that Sam Wallace got on the train at Griffiths, about four miles from Charlotte, at 6:40 or 6:50 in the morning. This was the time that Sam left Charlotte. That he went through Chester to Cornwallis.
John W. Hatley said that Beulah Carpenter brought a $20 bank note issued by the First National Bank of Shelby to the express office to get it changed; that he took the number and asked where she got it; he gave her the change for it and turned it over to the cashier. *Page 518 
There was evidence that Lula Wallace, wife of Sam Wallace, paid W. C. McDonald, furniture collector, about 11 June, 1912, a $20 bill when he went to collect $1.
There was evidence that on 23 July, 1912, Lula Wallace gave Mrs. W. B. Moore a $20 bill in payment of a bill for $4.98.
There was evidence that the defendant Sam Wallace had a $20 bill on an excursion which went to Mooresville, about the 26th of June.
There was evidence that the defendant was arrested twice prior to his arrest in September; that he was arrested once or twice after the excursion to Mooresville; that the witness Johnson talked to Sam about the money business, and he denied having but "75 cents to his name." After he had been arrested in October and asked to account for the $20 bill which he gave Mamie Crawford, he stated that he got this bill on an excursion train to Mooresville.
There was evidence that the defendant had three front teeth crowned with gold before he left Charlotte, and that after he was found the crowns had been taken off.
For the purpose of showing the rigid business methods of the express company, and for all other purposes for which the question may be competent, the defendant asked the State's witness, Marsh: "Do you know what bond Plexico was under?" Upon objection by the State, this question was excluded, and defendant excepted.
A policeman testified that, acting under a search warrant he searched the home of the defendant, and found there a letter which the (628) State identified as a letter written by the defendant to his wife. This letter was admitted in evidence, the defendant excepting.
The letter was material as impeaching evidence, the defendant having denied on the witness stand that he went to Tampa, Florida, after he left Charlotte, and the letter containing the statement that he had done so.
The State introduced evidence that after the defendant left Charlotte advertisement was made for him, and that post-cards were written to different points, describing him, and defendant excepted.
The defendant requested his Honor to charge the jury that, "taking all the evidence into consideration, it would not warrant the conviction of the defendant Sam Wallace, and you are therefore instructed to return a verdict of `Not guilty.'" "That although the evidence may excite suspicion, even strong suspicion, in your mind that the male defendant is a guilty person, still, if it is a rational conclusion that some other person may have committed the crime, it is you duty to acquit him."
These requests were denied, and defendant excepted. *Page 519 
His Honor charged the jury, among other things: "I am going to use the language as given by the attorneys for the State and the defendant. The State, as I have stated, relies upon circumstantial evidence in this case, and the court instructs you that each fact proving a necessary link in the chain must point to the guilt of the accused and must be as clearly and as distinctly proven as if the whole question depended upon it. The court further instructs you that in cases of this kind, where the State relies upon circumstantial evidence, that in order to convict the defendant the evidence must be clear, convincing, and conclusive; it must be natural, clear, and satisfactory. If the facts proven could all be true, and still not inconsistent with the innocence of the defendant, your verdict should be `Not guilty.' In order to convict the defendant, the evidence must naturally and necessarily imply his guilt, and it must exclude the probability that some one else might be the guilty party. If you should find that the evidence only raises in your minds a strong suspicion of the defendant Sam Wallace's guilt, or that it is not inconsistent with his innocence, the court (629) instructs you that it would be your duty to acquit him."
There was a verdict of guilty as to Sam Wallace, and from the judgment pronounced thereon, he appealed.
The exceptions chiefly relied on by the defendant are to the admissibility of the letter alleged to have been written by the defendant to his wife, and to the refusal to instruct the jury that the evidence was not sufficient to sustain a conviction. The objection to the introduction of the letter is upon two grounds:
1. That it is a confidential communication between husband and wife, which is excluded by the rules of the common law upon grounds of public policy.
2. That the letter was obtained by an illegal search of his premises, and to admit it in evidence is violative of the constitutional protection against unlawful searches and seizures, and of the principle that he cannot be compelled to incriminate himself.
1. The authorities seem to be uniform that a third person may testify to an oral communication between husband and wife, although his presence was not known, but there is much diversity of opinion as to the right to introduce a writing from one to the other in the hands of a third person. *Page 520 
The cases are collected in the notes to Gross v. State, 33 L.R.A. (N.S.), 478, and Hammons v. State, 3 A. E. Ann. Cases, 915.
It is difficult to find a satisfactory reason for the distinction. The rule of the common law is based on the confidential relationship existing between husband and wife, and the importance to the public of maintaining this relationship, deeming it wiser and to the public interest for some particular evidence to be suppressed than to require (630) the husband or wife to disclose a communication between them, as to do so "might be a cause of implacable discord and dissension between the husband and wife, and a means of great inconvenience" (S. v. Brittain, 117 N.C. 785); but the inhibition is as to the husband or wife and not to a third person, and if the communication by the husband is in writing, and is procured by a third person, without the consent or privity of the wife, the reason for the exclusion of communications at common law no longer exists.
In our opinion, the rule is stated correctly in Whar. Cr. Ev., sec. 398: "Confidential communications between husband and wife are so far privileged that the law refuses to permit either to be interrogated as to what occurred in their confidential intercourse during their marital relations, covering, therefore, admissions by silence as well as admissions by words. The privilege, however, is personal to the parties; a third person who happened to overhear a confidential conversation between husband and wife, may be examined as to such conversation. A letter, also, written confidentially by husband to wife is admissible against the husband, when brought into court by a third party."
2. The second objection is fully met by Adams v. New York, 192 U.S. 595. In that case the defendant was convicted of the crime of having in his possession certain gambling paraphernalia, and one of the assignments of error was:
"First. That the court erred in holding that by the reception in evidence of the defendant's private papers, seized in the raid of his premises, against his protest and without his consent, which had no relation whatsoever to the game of policy, for the possession of papers used in connection with which said game he was convicted, his constitutional right to be secure in his person papers, and effects against unreasonable searches and seizures was not violated, and that he was also thereby not compelled to be a witness against himself in contravention of the fourth, fifth, and fourteenth articles of amendment to the Constitution of the United States."
The Court, in passing on this assignment, says: "We think there was no violation of the constitutional guaranty of privileges from (631) unlawful search or seizure in the admission of this testimony. *Page 521 
Nor do we think the accused was compelled to incriminate himself," and 1 Greenleaf Ev., sec. 254a, is quoted with approval, as follows: "It may be mentioned in this place that though papers and other subjects of evidence may have been illegally taken from the possession of the party against whom they are offered, or otherwise unlawfully obtained, this is no valid objection to their admissibility if they are pertinent to the issue. The court will not take notice how they were obtained, whether lawfully or unlawfully, nor will it form an issue to determine that question."
The Court also discusses Boyd v. U.S., 116 U.S. 616, and shows that that decision is confined to the consideration of the constitutionality of an act compelling a party to produce papers in an action to enforce a forfeiture.
The same section from Greenleaf, taken from the Adams case, is approved in People v. Adams, 176 N.Y. 359; Com. v. Tibbetts, 157 Mass. 519; S. v.Griswold, 67 Conn. 306, and the same doctrine is declared in S. v. Fuller,34 Mont. 26; Jacobs v. People, 117 Ill. 206; Hartman v. U.S., 168 Fed., 33; Imboden v. People, 40 Colo. 142, and in other cases.
We are, therefore, of opinion there was no error in admitting the letter.
The evidence was sufficient to sustain a verdict of guilty. If true, the defendant had the opportunity to steal the money as charged; he was found in possession of at least one bill of the Shelby Bank of the same denomination as that stolen; he and his wife had no other bills of that denomination; he made false statements about the money and tried to induce another witness to make a false statement, and he fled.
We see no materiality in the question asked the witness Marsh, and there is nothing to indicate what answer the witness would have made.
The evidence as to advertising for defendant was competent on the question of flight, but in any event it had no relevancy except to prove that the defendant was absent from Charlotte, and this he admitted.
His Honor charged the jury as favorably as the defendant was entitled to. The first prayer for instructions could not have been given, as there was evidence of guilty sufficient to be submitted to the jury, and the second was embodied in the charge given, with (632) additions favorable to the defendant.
No error.
Cited: Whitford v. Ins. Co., 163 N.C. 229; S. v. Randall, 170 N.C. 760. *Page 522