STATE v. ROBERT FOWLER.

(Filed 9 November, 1916.)

**1. Criminal Law—Housebreaking—Evidence—Appeal and Error.**

Where an indictment charges the defendant with breaking in a building and stealing a certain sum of money therefrom, it is reversible error for the court to admit testimony, over the defendant's objection, that other buildings had been broken into and other thefts therein committed, when there is no evidence that the defendant committed any of the other crimes or had anything to do with them.

**2. Criminal Law—Warrant—Arrest—Reasonable Suspicion.**

Police officers of a town, charged with the duty of preventing breaches of the peace and arresting violators of the law, when acting upon reasonable suspicion thereof, and when necessary in case of a felony,

may make an arrest without a warrant, and take the person so arrested, within a reasonable time, or as soon as they can conveniently do so, before some magistrate authorized to hear the charge against him and commit him to bail.

### 3. Same—Articles in Possession—Evidence—Legal Possession.

It was made to appear upon affidavit and found as a fact by the trial judge that numerous houses had been unlawfully broken into in a certain community, and that the police officers of a town arrested the defendant at the depot at 4 o'clock a. m. with his confederate, who on seeing the uniformed officers, and being hailed by them, tried unsuccessfully to make their escape; that the officers suspected these men of having committed a felony, arrested them without a warrant, and upon one of them refusing to take his hand from his pocket, seized him and found therein a pistol of large caliber, the scabbard of the pistol in another, and a chisel in still another pocket; that he was charged with carrying a concealed weapon, and these articles kept by the order of the chief of police and solicitor to be used as evidence, and the prisoner was finally convicted of housebreaking: Held, the articles retained were in the legal possession of these officers, and the prisoner's motion to repossess them was properly denied.

### 4. Criminal Law—Constitutional Law—Search—Seizure of Articles—Possession of Premises—Consent—Legal Possession.

Where after arrest and upon investigation of a crime the officers of the law go to the residence of the accused and find his sisters in possession, request to search the premises for incriminatory evidence, obtain permission, and find certain articles which have a bearing as evidence upon the defendant's guilt, which are claimed by his sisters as their own, and voluntarily surrendered by them to the officers, these acts complained of by the prisoner are not an unconstitutional seizure of his property or search of his premises, but the articles came lawfully into the possession of the officers of the law, and defendant's motion to repossess them was properly disallowed.

Indictment for housebreaking and robbery, tried before Long, J., and a jury, at July Term, 1916, of Forsyth.

The prisoner was indicated for breaking into the banking house and storehouse of the Center Mercantile Company and stealing therefrom $100 in money. There was evidence tending to prove the guilt of the prisoner.

J. J. Cofer, a witness for the State, testified, among other things, as follows:

Q. Prior to this time do you know how many safes had been robbed in the city of Winston-Salem within two months preceding this time? A. I know that there had been some eight or ten of them.

Q. In the last six or eight months? A. Hauser Brothers had a store opened about eight months before that. Barbee-Sharp Company was opened some time later. Standard Oil Company had one blown

open. Armour & Co. had one that was attempted, but did not get it opened. I had that one opened and found there the nitroglycerine had been put on and soap at the top did not work. J. H. Thomas had one blown open. The Norfolk and Western Railway ticket office had one blown open, Center Mercantile Company had one blown open. One in Mount Airy, N. C., was blown open, and one in Lexington, N. C.

The prisoner objected to this testimony in apt time; the objection was overruled, and he excepted.

Before the case was called for trial the prisoner submitted a motion, based upon affidavits, for the return to him of certain property which he alleged had been taken from his person by the officers when he was arrested, to wit, one pistol, one chisel, and one flashlight, and from his sister's house one clipping from a tewspaper and one mutilated silver dollar. He alleged that this property was taken by the officers when they had no warrant for his arrest, nor any search warrant, and in violation of his constitutional rights; that the property is in the possession or custody of the officers, who are acting under instructions of the solicitor, and that the latter intends to use them as evidence against him on the trial. The judge reserved his decision on the motion until the evidence could be heard, and afterwards he found the facts to be as stated in the testimony of the officers. It appears from their testimony that they suspected the prisoner of having committed a felony by breaking and entering a house and stealing therefrom. As they said, several houses had been thus entered recently or just before the arrest was made. They found defendant and his companion, presumed to be his confederate or "pal," near the Union Station at 4 o'clock a. m., and, on seeing the officers, who were wearing their uniforms, and being hailed by them, they tried to make their escape, but were halted by the officers. The latter had no warrant, but were known officers of the city of Winston. It appears that they suspected the two men of having committed a crime, and they were on the lookout, because so many house-breakings had been committed about that time. These officers had special instructions from the chief of police to keep a careful watch for suspicious persons on the streets because of the recent robberies. The officers arrested the two men, and the officer who arrested the prisoner grabbed his hand, which was in his overcoat pocket, because he had asked him to take it from the pocket, which the prisoner had refused to do. The officer then pulled his hand out of the pocket and found a pistol of large caliber in it, and a chisel in the right hip pocket, the scabbard of the pistol being in the left hip pocket. The prisoner was then turned over to another officer and taken before the recorder, under a warrant for carrying a concealed weapon, convicted,

STATE *v.* FOWLER.

and sentenced to the roads. Officers afterwards went to the home of Ida Fowler, a sister of the prisoner, in consequence of information they had received. A sister-in-law of the prisoner also lived in the house. They were invited by the women to come in, and they did enter and search the house, but not until they first had received the voluntary and full permission of Ida Fowler to do so.

J. A. Thomas, a State's witness, testified in regard to the search as follows: "I did not learn that defendant's name was not Robert Feltz (name given by him) until he was tried for carrying a concealed weapon. He was being carried to jail and some man saw and recognized him, and furnished us the information. After his trial for carrying a concealed weapon, and in consequence of what others said, I took some officers with me and went where my information was that he lived. There were two ladies in the house when we got there, and I think two small children. One of the ladies said she was a sister, and she is the lady sitting there (pointing to Ida Fowler). That is the lady who occupied the house, about 2 miles from here south, about ½ mile from Center Mercantile Company. The ladies there gave me permission and told me to go ahead and search; I was perfectly welcome to search the house. They never made any demands for process after I got to the house. I told them that I came there and wanted to look over the house and explained my position, and they said it was perfectly all right, to go ahead and look just where I wanted to. I told them I was chief of police and was making an investigation. At the time I went to the house Mr. Cofer, first sergeant of the police force, Mr. Smothers, a member of the police force, Mr. Hauser, deputy sheriff, were with me. All the police officers were dressed in their uniforms. Mr. Hauser had on his badge to show that he was deputy sheriff. No threat of violence or any offer of intimidation was made. They invited me in and I got in the house and told them what my business was, and they told me to go ahead. We began the search. A large trunk was back in the back room, and I asked Miss Ida whose trunk that was, and she told me it was hers. I told her I wanted to look into it and she said all right, and I opened the trunk and looked into it and picked up a hand satchel. It had a man's handkerchief in it with a lot of silver money in it tied up, and I picked up the money and asked what that was, and the amount there was in it; told her that was one thing I was looking for. She told me she had $16 in it. I found $24 in it, that is, $15 in silver dollars and $9.50 tied up in a man's handkerchief. I examined the money and found one silver dollar in there. I examined the money and found this dollar. I examined the dollar and asked her where she got it, and I exchanged with her; gave her a dollar of mine and took this dollar. The silver

dollar was offered in evidence. The exchange was with her consent, and that was the extent of my search. I found a chisel-hammer in a bureau drawer; I did not bring it away. I showed the dollar I got from Miss Ida Fowler to some person connected with the Center Mercantile Company, and the chisel that was taken from the prisoner was taken over to the Center Mercantile Company. After I came from where I had seen Ida Fowler, and from the Center Mercantile Company where I had taken the chisel to compare with the imprints on the door, I went to the jail and served a warrant on the defendant for burglary. When I went to the house on Southside I found this woman, and she gave me her name as Ida Fowler; she told me it was her room, and it was her trunk, and this handbag in the trunk she told me was hers. She told me everything in the room was hers. When I went in she told me to go ahead and search, and made no objection, and made no protest to my taking the dollar. She showed me her brother's room —Robert's room, the defendant. Said she had a brother by the name of Robert, and showed me which room he occupied. The woman who was in the house with Ida Fowler was the defendant's brother's wife. I found no men's clothes in the house."

J. J. Cofer, a State's witness, testified: "I was with the chief of police on the occasion when he searched the house of Ida Fowler. The chief and Mr. Hauser went in Miss Ida's room and were searching there, and I stepped in where the other brother's wife was. She was lying across the foot of the bed, and I stopped and talked with her some, and told her that I wanted to search the house to see if we could find any stolen goods, or any money or anything that was taken from the Center Mercantile Company's safe. She said, 'All right; go ahead and search where you please.' I searched that room while the others were searching the west room, and I found a newspaper clipping that was in the room where her brother's wife was. The newspaper clipping had the report of the safe burglary at Centerville. I found a lot of flashlight batteries lying around the closet that had been burned out and thrown out—about half a dozen—and found a pair of shoes in the back room which had rubber heels on them and had little indents in them. The indents were filled with what looked like plaster paris. I found a chisel-hammer, or the wood part that goes with the chisel, in the washstand of the room where I was looking. I found some money in an envelope in another room. Miss Ida said it was her money, probably a $1 and a $5 bill."

The prisoner when arrested told the officers his name was Robert Feltz and that he lived in South Carolina. There was evidence tending to show defendant's guilt, besides that already stated.

STATE *v.* FOWLER.

The court refused to grant the order for the delivery of the property to the prisoner, and he excepted.

The jury convicted the prisoner and he appealed from the judgment upon the verdict.

*Attorney-General Bickett and Assistant Attorney-General Calvert for the State.*

*Hasting & Whicker and Fred M. Parrish for defendant.*

WALKER, J., after stating the case: The testimony in regard to the number of housebreakings which had recently been committed was incompetent and should not have been admitted by the court. It was irrelevant to the issue, as it did not tend to prove the fact of guilt, and was certainly prejudicial to the prisoner. Nothing could be more harmful than such evidence. It was calculated to inflame the minds of the jurors against the prisoner and to prevent that calm and impartial consideration of his case to which he was entitled. No connection is shown between the alleged crimes and this one, and there is no evidence even that the prisoner had anything to do with the commission of the other offenses. The evidence had no tendency to prove any relevant fact and had the effect only to provoke hostility to him. Underhill on Criminal Ev., sec. 87; *S. v. Frazier,* 118 N. C., 1257; 12 Cyc., 405; *S. v. McCall,* 131 N. C., 798; 16 Cyc., 1114; *S. v. Jeffries,* 117 N. C., 727; *Deming v. Gainey,* 95 N. C., 528. There are some exceptions to the rule excluding evidence of other distinct offenses, but they need not be discussed, as there is not even any proof here that the prisoner committed any of the other crimes. The evidence was wholly irrelevant and very prejudicial. Its admission entitles the prisoner to another trial.

As to the motion for the surrender of property to the prisoner, we are of the opinion that there was no error in the denial of it by the judge.

First. The property taken from the prisoner's person at the Union Station came lawfully into the possession of the officers. Numerous housebreakings had been committed in that vicinity and the policemen were on the lookout for the guilty parties. It is clearly inferable from the testimony that they suspected the two men seen by them on the night of the arrest, the prisoner being one of them. Being known officers, charged with the duty of preventing breaches of the peace and with arresting violators of the law, they had the right, on suspicion, to arrest the prisoner without a warrant and take him within a reasonable time, or as soon as they conveniently could do so, before some magistrate authorized to hear the charge against him and to commit or bail him.

This they did. It is said in *S. v. Belk,* 76 N. C., 13, that "A peace officer may arrest without warrant upon suspicion of felony, and for a breach of the peace committed in his presence." 5 Ruling Cases, sec. 5; *S. v. Bryant,* 65 N. C., 327; *S. v. Shelton,* 79 N. C., 605; *Neal v. Joyner,* 89 N. C., 287; *S. v. Campbell,* 107 N. C., 948; *Brockway v. Crawford,* 48 N. C., 433; 3 Cyc., 878. *Chief Justice Smith* said in *Neal v. Joyner, supra:* "A constable having reasonable ground to suspect that a felony has been committed is authorized to detain the party suspected until an inquiry shall be made by the proper authorities. And to this effect are the authorities in the absence of controlling legislation," citing *Allen v. Wright,* 8 Car. and P., 522; *Rohan v. Sawin,* 5 Cush., 281; *Burns v. Erben,* 40 N. Y., 463; Cooley on Torts, 175; *Brockway v. Crawford,* 48 N. C., 433. There is ample evidence upon which the jury were authorized to convict of the felony, and the principles stated in the above cases show that the officers were within the law when they arrested the prisoner. This being so, the case of *Weeks v. U. S.,* 232 U. S., 383, upon which the prisoner's counsel so much relied, does not support their position, but rather sustains the view that the property came lawfully into the possession of the officers. In that case it appeared that the officers acted illegally and in a high-handed and unjustifiable manner, and it was said: "What, then, is the present case? Before answering that inquiry specifically, it may be well by a process of exclusion to state what it is not. It is not an assertion of the right on the part of the Government, always recognized under English and American law, to search the person of the accused when legally arrested to discover and seize the fruits or evidences of crime. This right has been uniformly maintained in many cases. 1 Bishop on Criminal Procedure, sec. 211; Wharton Crim. Plead. and Practice (8th ed.), sec. 60; *Dillon v. O'Brien and Davis,* 16 Cox C. C., 245. Nor is it the case of testimony offered at a trial where the court is asked to stop and consider the illegal means by which proofs, otherwise competent, were obtained—of which we shall have occasion to treat later in this opinion. Nor is it the case of burglar's tools or other proofs of guilt found upon his arrest within the control of the accused." It is needless to cite other authority upon this branch of the case.

Second. As to the newspaper clipping, mutilated coin, and any other property taken from the house of Ida Fowler, sister of the prisoner, the case, if anything, is much stronger for the State. The testimony of the officers—which the court found to be true, having found the facts to be as therein stated—was all to the effect that they were careful not to enter the house without the consent of its owner, and that before they entered they had actually been invited by her to come

STATE *v.* FOWLER.

in, and that everything done by them after they entered was with the express consent of Ida Fowler and her sister-in-law. They were told by Ida that the house belonged to her, and also the contents of the room in which the search was made. She claimed the money and other property, and consented to an exchange of the mutilated silver coin for one of similar kind and denomination. We do not see how, upon this showing, the case can be brought within the principles declared in *Weeks v. U. S., supra.* There the papers were seized *in invitum,* while here they were taken by the officers with the full consent of the parties having at the time possession of·them with apparent ownership —a consent that the judge finds from the officer's testimony was given voluntarily and without the display of any force or compulsion. In *Weeks v. U. S., supra,* the Court said that where incriminatory documents (or other articles) are found in a lawful search, even where the find is incidental merely to a legal search for other goods, as, for instance, gambling paraphernalia, they may be used as evidence against the accused on a trial of an indictment for the crime to which the documents related, citing *Adams v. New York,* 192 U. S., 585. The Court further . said, approving in that respect the doctrine as stated in 1 Greenleaf on Evidence, sec. 254a: "It was no valid objection to the use of the papers that they had been thus seized, and the courts in the course of a trial will not make an issue to determine that question, and many State cases were cited supporting that doctrine. The same point had been ruled in *People v. Adams,* 176 N. Y., 351, from which decision the case was brought to this Court, where it was held that if the papers seized in addition to the policy slips were competent evidence in the case, as the court held they were, they were admissible in evidence at the trial, the Court saying: 'The court, when engaged in trying a criminal cause, will not take notice of the manner in which a witness has possessed himself of papers or other chattels, subjects of evidence, which are material and properly offered in evidence. *People v. Adams,* 176 N. Y., 351; 98 Am. St. Rep., 675; 68 N. E., 636; 63 L. R. A., 406. Such an investigation is not involved necessarily in the litigation in chief, and to pursue it would be to halt in the orderly progress of a cause, and consider incidentally a question which has happened to cross the path of such litigation, and which is wholly independent thereof.'" There could not be any objection to the introduction in evidence of the articles found by the officers and voluntarily given up by the two women who had them in their possession. This was not an illegal search and seizure within the meaning of the constitutional provision against them. 12 Cyc., 401, so declared, and the text is well supported by the cases cited in the notes. *Commonwealth v. Carbin,* 143 Mass., 124; *S. v. Griswold,* 67 Conn., 290 (33 L. R. A.,

227); *S. v. Van Tassel*, 103 Iowa, 6; *S. v. Atkinson*, 40 S. C., 363 (42 Am. St. Rep., 877).

It was held in *S. v. Griswold, supra:* "Searching the office of an accused person with the consent and aid of his servant, an agent, who was in possession, in order to obtain evidence against the accused is not in violation of the constitutional provision against unreasonable searches; and the taking away of an article found there, with the consent of the agent, is not a 'seizure.' "

That case would, therefore, seem to be precisely in point and a conclusive authority; if followed, as to both questions raised upon this record. The prisoner based his motion on the fourth, fifth, and fourteenth amendments to the Federal Constitution, and on the Constitution of the State, Art. I, secs. 11, 15, and 17.

With reference to a similar question presented in *S. v. Atkinson, supra,* the Court said: "The provisions of the Constitution of the United States relied upon are the fourth, fifth, and fourteenth amendments, and the provisions of the Constitution of this State may be found in sections 13 and 22 of Article I. In the fourth amendment of the Constitution of the United States it is declared that 'The right of the people to be secure in their persons, houses, papers, and effects against unreasonable searches and seizures shall not be violated,' etc. In the fifth amendment it is declared that no person 'shall be compelled in any criminal case to be a witness against himself,' etc.; while in the fourteenth amendment the declaration is: 'No State shall make or enforce any law which shall abridge the privileges or immunities of citizens of the United States,' etc. In the first place, we do not understand that the limitations imposed by the fourth and fifth amendments have any application to the powers of the State governments, but apply only to the powers of the Federal Government. As was said by *White, C. J.,* in *Spies v. Illinois,* 123 U. S., 166: 'The first ten articles of amendment were not intended to limit the powers of the State governments in respect to their own people, but to operate on the National Government alone, was decided more than half a century ago, and that decision has been steadily adhered to since,' citing numerous cases. Nor can it be said that the fourteenth amendment has the effect of extending the operation of the fourth and fifth amendments to the States; for, as was held in *Minor v. Happersett,* 21 Wall., 171: 'The amendment (speaking of the fourteenth) did not add to the privileges and immunities of a citizen. It simply furnished an additional guaranty for the protection of such as he already had.' And the same doctrine was held in *United States v. Cruikshank,* 92 U. S., 542. Besides, the same rights which are guaranteed by the fourth and fifth amendments to the Constitution of the United States are expressly

58—172

declared by sections 13 and 22 of Article I of the State Constitution; for in the former section the declaration is that no person shall 'be compelled to accuse or furnish evidence against himself,' while the language in section 22 is: 'All persons have a right to be secure from unreasonable searches or seizures of their persons, houses, papers, or possessions. The question now presented for our decision is not whether the persons who found the pieces of paper in the room of the defendant John Atkinson violated any of his legal rights by entering his room without authority, but whether the papers there found could be offered in evidence in this case; for, while it may be possible that it was a technical trespass to enter his room without authority, yet it does not by any means follow that the pieces of paper there found could not be offered in evidence.' "

This doctrine as to the competency of writings obtained by illegal means is well stated in 1 Greenleaf on Ev., sec. 254a: "It may be mentioned in this place that though papers and other subjects of evidence may have been illegally taken from the possession of the party against whom they are offered, or otherwise unlawfully obtained, this is no valid objection to their admissibility, if they are pertinent to the issue. The court will not take notice how they were obtained, whether lawfully or unlawfully, nor will it form an issue to determine that question." It was further said in *S. v. Atkinson, supra,* 42 Am. St. Rep., at p. 884: "There was nothing in the evidence tending to show that the defendants, or either of them, was compelled to furnish these papers, or that they were even asked to do so. Indeed, it seems that neither of the defendants was present, or even knew that the papers were found in the room when they were found; and there can, therefore, be no pretense that the defendants were compelled to furnish these papers as evidence against them."

So it will be seen that under the authority of those cases there has been no illegal search of his home, or forcible seizure of the prisoner's property, either from his person or his house, but all the property was obtained by the free consent of those who had charge of the place where they were found, in the case of some of the articles, and, as to the others, they were taken from his person in a lawful manner, as we have shown. The question as to the competency of the evidence is fully discussed and decided in *S. v. Wallace,* 162 N. C., 622.

The result is that a new trial is ordered because of the admission of improper testimony, and the order of the judge refusing to require the officers to deliver up the property is affirmed.

New trial.