STATE OF NORTH CAROLINA v. VANCE JEROME PARKER

No. 826SC423

(Filed 7 December 1982)

1. **Criminal Law § 34— evidence linking defendant to prior break-in at victim's house—irrelevant and prejudicial**

   Where there was not a scintilla of evidence linking defendant to a prior break-in in the victim's home, the erroneous admission of evidence concerning the prior break-in was prejudicial error entitling defendant to a new trial.

2. **Criminal Law § 75.9— denial of motion to suppress—statements volunteered or spontaneous**

   The trial court properly denied defendant's motion to suppress certain statements made to a police officer where the evidence showed that defendant voluntarily got into a patrol car and voluntarily agreed to accompany the officer to the scene of the crime and where there was no restriction of defendant's freedom so as to render him in custody until the officer saw defendant remove an article from his coat that was noted as missing from the crime scene. Further, it was equally clear that a statement by defendant "That's my hat in the driveway on the ground" was not the product of interrogation, but rather a spontaneous utterance.

APPEAL by defendant from *Allsbrook, Judge.* Judgment entered 18 December 1981 in Superior Court, HALIFAX County. Heard in the Court of Appeals 20 October 1982.

State v. Parker

Defendant was indicted for second degree burglary. He pled not guilty and was tried by a jury.

State's evidence tended to show that Nathaniel Britt lives at 207 Littleton Road, Roanoke Rapids, North Carolina and operates Britt's Flower Shop out of this residence. Around 9:30 p.m., Sunday, 25 October 1981, he placed a gold chain with a cross attached to it on top of a chest in his bedroom. He then went out to dinner, but before leaving, turned on all the lights, locked the back door and placed a bucket of apple cores against the door. Upon returning home, shortly after 11:00 p.m., Britt observed that the bucket of apple cores had been moved, the back door opened and the lights turned off. Britt observed a black man come out of the back door and run east toward Highway 158. Britt called the police. Officer Stainback arrived within five minutes of the call. Britt told him that the man he saw running from his house was black, medium height, wearing gray pants and a dark coat and that the man dropped his hat in the driveway as he ran east in the direction of Highway 158.

At about 11:19 p.m., Stainback made a radio broadcast giving this description and the direction in which the suspect ran. Officer Moody heard the broadcast and within three minutes observed defendant walking east on Highway 158, two blocks from Britt's Flower Shop. Defendant was wearing a dark coat, was of medium height and was not wearing a hat. Defendant voluntarily returned with Moody to Britt's Flower Shop. En route to the shop, defendant removed from his coat a gold chain with a cross attached and attempted to hide it. Upon arriving there defendant saw a hat lying in Britt's driveway and stated, "That's my hat in the driveway on the ground." Britt then identified the gold chain and cross shown to him by Officer Moody as the one he left on the chest. On cross-examination Britt stated that he had never known defendant before that night.

Defendant testified that he met Britt one week before 25 October 1981, visited Britt's house twice before this date and had a homosexual affair, for which he was paid, with Britt. Between 1:30 and 2:00 p.m., Sunday, 25 October he went to Britt's house to collect the money owed him. Britt told him to return at 11:00 p.m. Defendant returned between 9:30 and 10:00 p.m. but never entered the house. It appeared to defendant as if someone had already been in the house. The door was open, a gold chain was

lying on the doorstep and apple cores were spilled around the steps. He put the gold chain in his pocket. While standing outside, Britt drove up with another man. Defendant decided to run because he feared Britt might think that he broke into the house.

Defendant was convicted of second degree burglary and sentenced to imprisonment. Defendant appeals.

*Attorney General Edmisten, by Assistant Attorney General Michael Rivers Morgan, for the State.*

*Crew and Stevenson, by Phyllis B. Stevenson, for defendant.*

JOHNSON, Judge.

[1] During direct examination, Britt testified that upon observing that the bucket of apple cores had been moved from the back door, he said to his cousin who was with him, "Oh my God, somebody has been in my house again." Over defendant's objection, Britt was allowed to testify as follows regarding the prior break-in of 24 October 1981:

> On this Saturday night my place had been broken into and that was the reason I placed that bucket of apple cores there so I could tell if someone had entered again . . .
>
> . . .
>
> When I unlocked my back door to get—enter in, I discovered the lock to my other door was laying on the floor and the door was open . . .
>
> . . .
>
> I just kept walking and I went on up into my office and, when I did, my cash register had been damaged. The outside had been taken off and it looked like a screw-driver or something had been used to try to get into it—into the drawer, and it had torn it up. And I then picked up the phone and called the police.

Defendant contends the court erred in allowing this testimony and that this error was compounded by the State's cross-examination of defendant and defendant's mother, Beulah Parker, concerning defendant's activities of Saturday night, 24 October 1981. We note from the record the State cross-examined

defendant and his mother regarding defendant's activities on that evening. While the effect of this examination was to link defendant to the break-in of 24 October 1981 in the minds of the jurors, the State produced no evidence connecting defendant with that break-in. The evidence admitted was irrelevant and purely prejudicial.

The general rule is that in a prosecution for a particular crime, the State cannot offer evidence tending to show that the accused has committed another distinct, independent, or separate offense, even though the other offense is of the same nature as the crime charged. *State v. McClain,* 240 N.C. 171, 81 S.E. 2d 364 (1954).

In *State v. Fowler,* 172 N.C. 905, 90 S.E. 408 (1916), the defendant was charged with the crimes of breaking and entering and larceny. Over defendant's objection, the State was allowed to introduce testimony regarding other recent house breakings within the community. There was no evidence showing any connection between the other house breakings and the crimes for which defendant was being tried, nor any evidence that the defendant had anything to do with the other recent crimes. The Supreme Court awarded the defendant a new trial, stating that the evidence of unrelated crimes

> was irrelevant to the issue, as it did not tend to prove the fact of guilt, and was certainly prejudicial to the prisoner. Nothing could be more harmful than such evidence. It was calculated to inflame the minds of the jurors against the prisoner, and to prevent that calm and impartial consideration of his case to which he was entitled.

*Id.* at 908, 90 S.E. at 409-10.

In the case *sub judice* not a scintilla of evidence linking defendant to the crime of 24 October 1981 was produced at trial. We therefore hold that the erroneous admission of this evidence regarding the break-in of 24 October 1981 was prejudicial error entitling defendant to a new trial.

Although we grant defendant a new trial, we will examine defendant's remaining assignments as they are likely to be raised at a retrial of this case.

[2]   Defendant next contends that the trial court erred in failing to exclude statements made by defendant before he was advised of his constitutional rights as required by *Miranda v. Arizona,* 384 U.S. 436, 16 L.Ed. 2d 694, 86 S.Ct. 1602 (1966). We disagree.

The evidence shows that within three minutes of hearing Officer Stainback's radio broadcast regarding the break-in Officer Moody saw defendant, who fit the broadcasted description, two blocks from Britt's house. Moody testified that he stopped his car in front of the defendant, and defendant walked up to the window. Moody asked, "would you mind having a seat in the car? I'd like to ask you a few questions." Defendant responded, "fine," walked around, and sat in the car.

Q. What happened then?

A. I then asked him his name and he gave his name as Vance Parker. I asked him his address and he gave a Route Two address. I've forgot [sic] the box number. And I asked him a general question, had he been in the area of Britt's Flower Shop. He started — all of a sudden just blurted out, I've just been talking to a man just before you stopped me and he said you all were after me because my hat was in the driveway of Britt's Flower Shop and you all were accusing me of breaking into Britt's Flower Shop.

Q. Did you ask him anything other than those three questions which you've just mentioned?

A. No sir, I did not.

Q. And he made that response to you at that time.

A. Yes sir.

Q. What did you say when he told you that?

A. I asked him again had he been in the area of Britt's Flower Shop. He said approximately two or two and a half hours ago.

Q. What happened then?

A. He got back on the subject that he had lost his hat in the area of Britt's Flower Shop. I asked him to describe the hat to me and he said it was a blue denim hat with a patch on the

front with a blazer on it with a yellow stripe in it. I then asked Mr. Parker would he willingly go with me back to Britt's Flower Shop. He said, yes, I will. En route to Britt's Flower Shop, Mr. Parker asked me could he smoke a cigarette. I said, yes, he could. And I noticed Mr. Parker was trying to take something out of his coat underneath his coat trying to hide it and I looked over at him and he was taking a gold chain out from under his coat. Asked him what he had and he pulled it out and showed it to me and it was a gold chain with a gold cross on it. I then asked him where did he find it — where did he get it from and he said he found it in the road about a half a block up. I then asked could I see it and he said, yes, and handed it to me. And then I arrived at Britt's Flower Shop and I got out of my patrol car and Parker stayed in. I walked up to Officer Stainback, in turn, took the chain with the cross and Officer Stainback, in turn, took the chain and Mr. Parker got out of my patrol car and started walking forward and said, that's my hat laying on the ground.

Q. At the time you asked him the first question about being in the vicinity of Britt's Flower Shop, had you mentioned a break-in at the Flower Shop?

A. No, sir, I had not.

Q. At anytime before you stopped at Britt's Flower Shop and got out of the car leaving him there, had you said anything to him about a break-in?

A. No, sir, I had not.

Q. What did you say to him when you parked your car and got out to go to Officer Stainback?

A. I asked him to wait there just for one minute . . .

. . .

Q. He was not a suspect even though he matched the description perfectly that came over the radio?

A. I had no direct evidence that he was the one . . .

. . .

Q. And it is your testimony before this court that if he had refused to talk to you, you would not have stopped him and put him under arrest, that you would have let him keep right on going?

A. Yes, ma'am.

Officer Moody further testified that once he saw defendant pull the gold chain out, he would not have permitted defendant to leave the car even if defendant had requested.

The trial court conducted *voir dire* on defendant's motion to suppress his statements and concluded that defendant voluntarily got into Moody's patrol car and voluntarily agreed to accompany Moody to Britt's Flower Shop, finding that from the time Moody stopped defendant until he observed defendant remove a gold chain from his jacket, defendant was not in custody, and any statements defendant made during this time frame were not in response to custodial interrogation. Therefore, the *Miranda* warnings were not required. From the moment Officer Moody observed defendant remove the gold chain and cross from his coat, defendant was in custody. Defendant's statement, "That's my hat" was not the result of interrogation but was spontaneous and voluntarily made.

The trial court excluded defendant's statement that he found the gold chain and cross about a half block away from the Flower Shop. The trial court denied defendant's motion to suppress certain statements made by defendant, including the statement that he had been stopped by a person just before being stopped by Moody, who told him the police were looking for him and had accused him of breaking into Britt's Flower Shop because his hat was in the driveway at Britt's Flower Shop. The court also denied defendant's motion to suppress defendant's statement, "That's my hat in the driveway on the ground."

It is well established that an inculpatory statement obtained as a result of a custodial interrogation, without *Miranda* warnings, is inadmissible. 2 Stansbury's N.C. Evidence § 184 (Brandis Rev. 1973). However, such warnings are not required when defendant is not in custody or otherwise deprived of his freedom of action in any significant way. *Miranda v. Arizona, supra; State v. Sykes,* 285 N.C. 202, 203 S.E. 2d 849 (1974).

Police officers are not required to administer *Miranda* warnings to everyone whom they question. Nor is the requirement of warnings to be imposed simply because the questioned person is one whom the police suspect. *Miranda* warnings are required only where there has been such a restriction of a person's freedom so as to render him in custody. *Oregon v. Mathiason*, 429 U.S. 492, 50 L.Ed. 2d 714, 97 S.Ct. 711 (1977).

Volunteered and spontaneous statements made by a defendant to a police officer without any interrogation on the part of the officer are not barred by any theory of our law. *Miranda v. Arizona, supra; State v. Porter*, 303 N.C. 680, 281 S.E. 2d 377 (1981); *State v. Bell*, 279 N.C. 173, 181 S.E. 2d 461 (1971); 4 Strong's N.C. Index 3d, Criminal Law, 75.9.

In the case *sub judice* the evidence shows that defendant voluntarily got into the patrol car and voluntarily agreed to accompany Officer Moody to Britt's Flower Shop. From the time defendant was stopped until the time Officer Moody saw defendant remove the gold chain and cross from his coat, there had been no restriction of defendant's freedom so as to render him in custody. It is equally clear that the statement, "That's my hat in the driveway on the ground" was not the product of interrogation, but rather a spontaneous utterance by defendant. We therefore hold that the trial court correctly denied defendant's motion to suppress.

We have examined defendant's remaining assignments of error and find them to be without merit.

New trial.

Judges ARNOLD and HILL concur.