PEOPLE v CHISM

Opinion of the Court

1. Criminal Law—Speedy Trial—Delay—Prejudice.

A balancing test necessarily compels courts to approach speedy trial on an ad hoc basis and four factors are identified: length of delay, the reason for the delay, the defendant's assertion of his right, and prejudice to the defendant.

2. Criminal Law—Speedy Trial—Attorney and Client—Appeal and Error.

Defendant had a right to appeal denial of his request for counsel as an indigent but time reasonably consumed on appeal cannot be considered as in derogation of a speedy trial.

3. Criminal Law—Speedy Trial—Motion to Dismiss—Motion to Quash.

Defendant fulfilled his obligation to protect his right to speedy

References for Points in Headnotes

[1, 5, 19] 21 Am Jur 2d, Criminal Law §§ 241, 242, 245–248.

[2] 21 Am Jur 2d, Criminal Law § 255.

[3] 21 Am Jur 2d, Criminal Law §§ 245, 252, 255, 256.

[4, 5] 21 Am Jur 2d, Criminal Law §§ 221, 234 et seq.

[6] 40 Am Jur 2d, Homicide §§ 282, 437, 439.

[7, 25] 29 Am Jur 2d, Evidence §§ 320, 324, 326.
53 Am Jur, Trial § 650.

[8] 47 Am Jur, Searches and Seizures §§ 16 et seq., 31, 66.

[9–11] 47 Am Jur, Searches and Seizures § 71.

[10, 11] 29 Am Jur 2d, Evidence §§ 410–412, 425.

[12] 29 Am Jur 2d, Evidence § 415 et seq.
Federal Constitution as affecting admissibility of evidence obtained by illegal search and seizure. 84 ALR2d 959.
"Fruit of the poisonous tree" doctrine excluding evidence derived from information gained in illegal search. 43 ALR3d 385.

[13–18, 23] 47 Am Jur, Searches and Seizures §§ 6, 23.
Authority to consent for another to search or seizure. 31 ALR2d 1078.

[20] 4 Am Jur 2d, Appeal and Error § 160.

[21] 21 Am Jur 2d, Criminal Law §§ 255, 256.

[22] 47 Am Jur, Searches and Seizures § 40.

[24] 40 Am Jur 2d, Homicide §§ 315–319, 452, 565–567.

trial where he *pro per* moved to dismiss because of denial of a speedy trial approximately 8 months after arrest and he moved to quash for denial of speedy trial some 20 months after arrest and about 2 months after assignment of trial counsel.

4. CRIMINAL LAW—PREJUDICE—PRETRIAL INCARCERATION—WITNESSES.

There are two types of prejudice which a defendant in a criminal case may experience, prejudice to his person and prejudice to his defense; prejudice to his person would take the form of oppressive pretrial incarceration leading to anxiety and concern and prejudice to his defense might include key witnesses being unavailable.

5. HOMICIDE—TRIAL—FAIR TRIAL—DELAY—PRETRIAL INCARCERATION —DISMISSAL—PREJUDICE—APPEAL AND ERROR—EVIDENCE.

The processing of a first-degree murder case while not exemplary is not a case warranting dismissal where the case came to trial 27 months after arrest, approximately 14-1/2 months of that time was consumed upon an appeal by defendant from denial of appointed counsel; there was no evidence that a fair trial was jeopardized by delay, there was no undue prejudice because of presentence incarceration and no prejudice to his defense was brought into evidence.

6. HOMICIDE—MURDER—INTENT—MOTIVE—EVIDENCE—PRIOR ACTS— SEPARATE CRIME.

Murder involves intent; therefore, in a prosecution for murder, evidence that a bottle of pills containing a caustic substance had been mailed to the deceased victim and a piece of wrapping paper found on the shelf with the bottle which was on the bottle when it was received was admitted over defendant's objection and expert witnesses testified, over defendant's further objection, that in their opinion defendant's handwriting was on the wrappings on the bottle and on a bomb, which killed the victim, defendant by making bald admissions that someone intended to send the bottle through the mail could not shut out evidence by the prosecution that tended to show that defendant was the one who intended to do the act because intent was at issue and was a material and relevant element in the case; the act in sending the pills was admissible to show the intent to murder, and the trial judge did not err in allowing the pill bottle and wrapper into evidence for the purpose of establishing defendant's intention of doing away with the deceased since the motive or intent of a defendant may be shown by prior acts, even though they would constitute commission of another crime (MCLA 768.27).

7. Criminal Law—Evidence—Prior Crimes—Motive—Intent—In-
    structions—Failure to Object—Appeal and Error.

There is no absolute requirement that a trial judge give limiting
instructions as to the admissibility of evidence of prior crimes
admitted for the purpose of proving motive or intent, in the
absence of request or proper objection; therefore, failure to
instruct as to the limited admissibility of that evidence was not
reversible error where there was no request for such instruc-
tion and no objection to the failure to instruct.

8. Searches and Seizures—Search Warrant—Constitutional
    Law.

A warrantless search and seizure generally is unreasonable per
se and violative of the United States and Michigan Constitu-
tions (US Const, Am IV; Const 1963, art 1, § 11).

9. Searches and Seizures—Search Warrant—Consent—Waiver—
    Question of Fact—Evidence—Inferences.

Right to be secure from warrantless searches may be waived by
defendant's valid consent and whether a consent is valid is a
matter of fact based upon the evidence and all reasonable
inferences to be drawn from it.

10. Searches and Seizures—Consent—Discretion.

Decision of trial judge, exercising his discretion, that consent to
search defendant's residence, curtilage, and automobiles with-
out a search warrant was valid and was not clearly erroneous
where defendant was given the *Miranda* warnings informing
him of his rights, he stated he understood these rights, his
written consent verifies that he was informed of his "constitu-
tional right not to have a search made of the premises herein-
after mentioned without a search warrant" and of his "right to
refuse to consent to a search", he was informed as to the
purpose of the search and that the fruits thereof might be used
against him in evidence, and the record was also replete with
evidence that the consent was freely, voluntarily, and unequiv-
ocally given with no hint of coercion or duress.

11. Searches and Seizures—Search Warrant.

It is required that a defendant be informed that "he need not
submit to a search"; a fine explanation of the role of search
warrants is not required.

12. Searches and Seizures—Coercion.

A search and its fruits are illegal whatever the other circum-
stances are, if the search is coerced.

13. SEARCHES AND SEIZURES—LANDLORD AND TENANT—CONSENT—
   CONTRACTS.

   An owner may not give consent to search premises of a tenant unless contractually provided for.

14. SEARCHES AND SEIZURES—CONSENT.

   An owner may give consent to search of a room in a house which is commonly used and not the part of the house assigned to defendant, particularly if the object of the search is also commonly used.

15. SEARCHES AND SEIZURES—CONSENT.

   The owner of a house may give consent to search a container jointly used by the owner and the defendant and left in the householder's house.

16. SEARCHES AND SEIZURES—HUSBAND AND WIFE—ASSUMPTION OF
   RISK.

   Defendant "assumed the risk" that his wife would turn over particular items to the police where the wife was a joint owner of the house to be searched, a joint occupant as well as a joint owner of the bedroom where the objects seized were to be found and the checks to be seized were from a jointly handled checking account in the wife's name alone.

17. SEARCHES AND SEIZURES—CONSENT—HUSBAND AND WIFE.

   Wife could give consent to search a jointly occupied and owned bedroom of a jointly owned house.

18. SEARCHES AND SEIZURES—HUSBAND AND WIFE—CONSENT—WAIVER
   —EVIDENCE.

   Wife could and did consent to get items requested by police and deliver those items to them and her consent was freely, knowingly and voluntarily given where she had knowledge of the purpose of the search, she was not coerced in any way, she knew that her husband had signed a waiver to search the premises, she had joint use and control of the house which extended to the bedroom where the items were found, and there is no evidence that defendant exercised exclusive control or possession over those items seized.

CONCURRING OPINION

LEVIN, J.

19. CRIMINAL LAW—SPEEDY TRIAL—APPEAL AND ERROR.

   *Differences between lawyers, judges, trial and appellate, and the*

*time required to resolve them through the time-consuming appellate process does not deny a defendant a speedy trial.*

20. CRIMINAL LAW—APPEAL AND ERROR—COURT OF APPEALS—INTER-LOCUTORY APPEALS—DISCRETION—ADVANCEMENT ON CALENDAR.

*Defendant's motion for advancement of an interlocutory appeal on the calendar of the Court of Appeals in a criminal case should have been granted; however, that Court was not constitutionally obliged to hear during the summer recess the appeal which it granted defendant in the exercise of discretion.*

21. CRIMINAL LAW—DELAY IN TRIAL—INTERLOCUTORY APPEALS—DISMISSAL OF PROSECUTION.

*Delay in trial of a criminal case, while unfortunate, is not so unreasonable as would justify dismissal of the prosecution where the unjustified portion of the delay of perhaps four months was caused by an interlocutory appeal.*

22. SEARCHES AND SEIZURES—AUTHORIZATION TO SEARCH.

*There is no reason to read an authorization for a complete search as justifying but one visit to defendant's home, particularly where what was taken on the second visit was espied on the first visit and was seized within 30 hours after the authorization to search and seize was signed.*

23. SEARCHES AND SEIZURES—CONSENT—CO-OWNER.

*Authority of a co-owner to authorize a search of jointly-owned property should be limited to a case where the person giving the consent is himself under suspicion and so consents in an effort to exculpate himself.*

24. HOMICIDE—MURDER—PRIOR ATTEMPTS—EVIDENCE—CIRCUMSTANTIAL EVIDENCE—IDENTIFICATION.

*Evidence is admissible that tends to show a prior attempt to murder the victim by the person charged on the same principle as evidence that the person charged as the murderer has threatened the life of the victim clearly would be admissible in a case where it is sought to establish the identity of the murderer with circumstantial evidence.*

25. CRIMINAL LAW—INSTRUCTIONS—PRIOR CRIMES—APPEAL AND ERROR—REQUEST FOR INSTRUCTION.

*Failure to instruct on the limited purpose for which other crimes evidence is received is generally not error in the absence of a request to charge.*

Appeal from Court of Appeals, Division 3, Fitz-

gerald, P. J., and Holbrook and Bronson, JJ., affirming Calhoun, Creighton R. Coleman, J. Submitted January 4, 1973. (No. 5 January Term 1973, Docket No. 53,409.) Decided October 17, 1973.

32 Mich App 610 affirmed.

Enoch D. Chism was convicted of first-degree murder. Defendant appealed to the Court of Appeals. Affirmed. Defendant appeals. Affirmed.

*Frank J. Kelley,* Attorney General, *Robert A. Derengoski,* Solicitor General, and *Stanley Everett,* Prosecuting Attorney, for the people.

*Allen, Worth, Hatch & Calderone,* for defendant.

*Amicus Curiae:* American Civil Liberties Union of Michigan (by *Joel M. Shere, Sheridan Holzman,* and *James K. Robinson).*

WILLIAMS, J. This case raises three issues:
1. unconstitutional denial of speedy trial;
2. admissibility of evidence of prior similar action under MCLA 768.27; MSA 28.1050; and
3. validity of particular search and seizures.

## I. FACTS

Mrs. Nola Puyear was killed in the presence of her husband when a package addressed to her and delivered through the mails exploded as she attempted to open it. Investigation produced pieces of the wrapper containing the hand lettered address, masking tape and metal fragments identified as being from a "Fiske" type battery. The wrapper also disclosed a postmark "Marshall",

which testimony showed was a cancellation peculiar to Marshall, Michigan.

Search of the Puyear establishment also produced a bottle of pills and wrapper with handwriting on it. Mr. Puyear testified the pills had been received 6 to 12 months prior. Chemical analysis after Mrs. Puyear's death established the pills as lye although the label indicated tranquilizers.

To establish their case the police interviewed various Marshall area residents, collecting handwriting samples. Defendant was interviewed and gave handwriting samples. Subsequently he was arrested and charged with first-degree murder on October 11, 1967. After a "Miranda" warning he gave written consent to the search of his house as will more fully be discussed later. Defendant's wife also gave written consent to search the house. The search was made October 11, 1967. However, on October 12, 1967 officers returned to the house and requested and were given certain checks and a daily record book seen but not taken the day before.

Subsequent to arrest, defendant on October 18, 1967 requested appointment of counsel as an indigent. Such property as he had he had conveyed to his wife. Counsel was denied on January 9, 1968 and appeal therefrom was taken with counsel specially appointed for the appeal. It was not until April 23, 1969 that the Court of Appeals ruled that defendant was entitled to assigned counsel. In the meantime with specially assigned counsel defendant was given a preliminary hearing and bound over to stand trial for murder on November 16, 1967. The trial court was ready to commence trial promptly after the Court of Appeals ruled, but defendant's new counsel needed time and moved to quash for denial of speedy trial on June

19, 1969, as defendant had done *pro per* June 20, 1968. Thereafter the trial court denied the motion and on January 20, 1970, 27 months after arrest, the case came to trial. On January 30, 1970 defendant was convicted of murder in the first degree. Defendant appealed. The Court of Appeals affirmed. 32 Mich App 610; 189 NW2d 435 (1971). Defendant has been in jail since arrest.

## II. SPEEDY TRIAL

The facts relating to a speedy trial are set out in full in Appendix A. It took the case 27 months to come to trial. However, the case was approximately 14-1/2 months on appeal so that the trial court actually had the case about 12-1/2 months.

The United States Supreme Court in *Barker v Wingo*, 407 US 514; 92 S Ct 2182; 33 L Ed 2d 101 (1972) established a general rule applicable to *speedy trial* cases, which this Court has recognized as the definitive test in this area. *People v Grimmett*, 388 Mich 590, 602; 202 NW2d 278 (1972); *People v Collins*, 388 Mich 680, 688; 202 NW2d 769 (1972). The United States Supreme Court stated the rule as follows:

"A balancing test necessarily compels courts to approach speedy trial on an *ad hoc* basis. * * * Though some might express them in different ways, we identify four such factors: Length of delay, the reason for the delay, the defendant's assertion of his right, and prejudice to the defendant." 407 US 514, 530.

### A. *Length of Delay*

As we said in *Collins:*

"The United States Supreme Court stated that: 'The length of delay is to some extent a triggering mecha-

nism. Until there is some delay which is presumptively prejudicial there is no necessity for inquiry into the other factors that go into the balance.' 407 US 514, 530. The Court noted that the delay which would provoke such an inquiry was necessarily dependent upon the 'peculiar circumstances of the case.' " 388 Mich 680, 688–689.

The total length of delay in this case is 27 months. Without appropriate explanation this is far too long. In *Collins* we said:

"The 15 months, including 7 months in jail is far in excess of the legislative 6-month standard and much too close to the 18-month rule of *Den Uyl.* It is unduly long unless the other factors require a different result." 388 Mich 680, 690.

## B. *Reason for the Delay*

As the United States Supreme Court stated in *Barker,* "[t]he approach we accept is a balancing test, in which the conduct of both the prosecution and the defendant are weighed." 407 US 514, 530.

In assessing responsibility for the length of the case, it must be considered that of the 27 months duration 12-1/2 months was consumed in the trial court and 14-1/2 months on appeal originated by the defendant.

Of the 12-1/2 months spent in the trial court, a little over 3 months were spent before appeal and about 9 months after appeal. Most of the three months prior to appeal was spent in consideration of defendant's request for counsel as an indigent. The trial judge held hearings and then took the matter under consideration. The problem was that defendant had created his own indigency by voluntarily transferring his assets to his wife. She was separating from him and would not pay for his

lawyer. It is difficult to say that the time the trial judge took to rule adversely here materially affected defendant's rights.

Of the nine months in the trial court subsequent to the appellate decision allowing counsel, seven months were to meet defendant's and his counsel's convenience.

As a consequence it must be concluded that the time spent in trial court while deliberate was probably legitimate and the responsibility for the length of the largest portion of it was defendant's not the prosecution's or the trial court's.

Defendant certainly had a right to appeal but time reasonably consumed on appeal cannot be considered as in derogation of a speedy trial. *People v Den Uyl,* 320 Mich 477, 489–490; 31 NW2d 699 (1948). Both defendant and the prosecutor moved to accelerate the case, and the whole 14-1/2 months required by the Court of Appeals to dispose of this motion is hard to justify under the circumstances, particularly in light of that Court's abbreviating the time for filing briefs and motion to advance by defendant agreed in by the prosecutor. Consequently, it must be recognized that a part of the appeal time is indeed excessive and that this must be taken into consideration.

In considering the whole 27 months, however, between arrest and commencement of trial the major portion can be justified as necessary to process the case or to fit the defendant's convenience. There was some excess time taken on appeal.

C. *Defendant's Responsibility to Assert His Right*

The United States Supreme Court in *Barker v Wingo, supra,* stated:

"[D]efendant's assertion or failure to assert his right to a speedy trial is one of the factors to be considered in an inquiry into the deprivation of the right." 407 US 514, 528.

In the instant case, defendant *pro per* moved to dismiss because of denial of a speedy trial approximately eight months after arrest and while his assigned counsel for appeal of more than four months had his case on appeal. The trial court did not hear this motion until almost ten months had elapsed, partially because the matter was on appeal, although it was still on appeal when he decided the motion a few days later.

Some 20 months after arrest and about 2 months after assignment of trial counsel, defendant moved to quash for denial of speedy trial.

Defendant moved with reasonable dispatch all things being considered and raised his right to speedy trial once *pro per* and once promptly after receiving assigned counsel. It must be recognized that defendant fulfilled his obligation to protect his right to speedy trial.

## D. *Prejudice to the Defendant*

There are two types of prejudice which a defendant may experience, that is, prejudice to his person and prejudice to his defense. Prejudice to his person would take the form of oppressive pretrial incarceration leading to anxiety and concern. Prejudice to his defense might include key witnesses being unavailable. Impairment of defense is the most serious, "because the inability of a defendant adequately to prepare his case skews the fairness of the entire system." *Barker,* 407 US 514, 532.

*Barker* found no undue prejudice in ten months

incarceration. Defendant's 27 months incarceration certainly is too long unless otherwise justified.

There is no testimony relevant to prejudice to defendant's defense because of the length of the case such as loss of witnesses, etc.

In sum, defendant suffered considerable personal deprivation by long incarceration, but it cannot be said that his ability to defend himself was in any significant way prejudiced.

### E. *Conclusion as to Speedy Trial*

In attempting to balance the four factors and give each its due, one begins with the 27 months from arrest to start of trial strongly triggering concern about denial of a speedy trial. However, analysis of what happened during those 27 months supplies a good reason for most of the time spent except for an uncomfortable feeling that the appeal period was over long. If the defendant is entitled to relief because of denial of speedy trial he certainly cannot be deprived of such relief for failure to assert his rights because he asserted them timely and vigorously. Finally, on the matter of prejudice to defendant because of the length of time before his trial, the most important thing is that there is no evidence that a fair trial was jeopardized by delay, although obviously 27 months of incarceration is not an insignificant personal hardship.

In weighing all of these factors together, it must be concluded that the length of the trial was in large part the necessary result of the defendant properly pursuing his legal procedures. Because of the nature of the crime and in absence of evidence to the contrary, it must be assumed that the defendant was not a bailable subject. The necessar-

ily protracted litigation and defendant's non-bailable condition account for the length of his presentence incarceration. So there is no undue prejudice there and no prejudice to his defense was brought into evidence.

This balancing of factors results in a long, but largely an explainably long case with explainable personal hardship due to incarceration but without prejudice to defendant's defense. Under these circumstances the processing of the case while not exemplary is not a case under *Barker v Wingo, supra,* warranting dismissal.

## III. PRIOR SIMILAR ACTION

Defendant next claims that the failure of the trial court, in the absence of request, to give the jury a limiting instruction on the admission of two exhibits, a pill bottle containing lye pills and wrapper, that tended to indicate defendant made a prior attempt on the life of deceased, was reversible error.

Defendant's argument has two separate parts. First defendant argues that as motive and intent were not in issue, it was error to introduce evidence of prior acts under MCLA 768.27; MSA 28.1050[1] to show defendant's motive or intent. The second branch of the argument is that even if the evidence was admissible, the trial judge erred,

---

[1] MCLA 768.27; MSA 28.1050 provides:

"In any criminal case where the defendant's motive, intent, the absence of, mistake or accident on his part, or the defendant's scheme, plan or system in doing an act, is material, any like acts or other acts of the defendant which may tend to show his motive, intent, the absence of, mistake or accident on his part, or the defendant's scheme, plan or system in doing the act, in question, may be proved, whether they are contemporaneous with or prior or subsequent thereto; notwithstanding that such proof may show or tend to show the commission of another or prior or subsequent crime by the defendant."

even in the absence of request, in not instructing
the jury as to the limited purpose for which such
evidence was admissible.

### A. *Was the Evidence Admissible under MCLA 768.27; MSA 28.1050?*

At the time of trial, the prosecutor offered as
evidence Exhibits 14 and 15, being respectively a
pill bottle labeled as tranquilizers though contain-
ing a caustic substance[2] which had been transmit-
ted through the mail to the deceased, and a piece
of wrapping paper found on the shelf with the
bottle which was on the bottle at the time it was
received.[3] The defendant raised objection to the
admission of this evidence. The prosecution
claimed that the evidence was to show intent,
plan, and design. The trial judge ruled that it was
admissible "under the statute having to do with
defendant's mode of intent in the absence of mis-
take or accident". Over further objection of defend-
ant, the expert witnesses for the prosecution testi-
fied that in their opinion the handwriting on the
pill wrapper and the package wrapper that the

---

[2] Upon direct examination of a toxocologist, the prosecution asked
him what the pills in the bottle contained.

"*A.* I made an analysis of the contents * * * , and being very
caustic it appears it was sodium hydroxide.

\* \* \*

"*Q.* I see. Is that sometimes referred to as lye?

"*A.* Yes."

[3] Though it was claimed by defendant that it is unclear as to
whether the bottle came in this particular wrapper, there was conclu-
sive testimony that this was in fact the wrapper. One patron of the
restaurant testified that she had been present the day the pill
package arrived and had seen deceased open it. She stated, "[I]t looks
like the paper that was wrapped around a bottle of pills." Also, a
policeman who gathered this evidence from the cafeteria after the
explosion testified, after identifying the bottle and wrapper, that
"[t]his is a small glass bottle which was contained within the brown
paper wrapper that I located in the kitchen of the Tasty Cafe."

bomb was delivered in was the defendant's.[4] The Court of Appeals affirmed the trial court's ruling. They stated:

"It would seem to be reasonable under the statute to show, by previous acts, that defendant intended or planned to kill the deceased by sending some form of harmful article to her through the mail." 32 Mich App 610, 625–626.

The crux of defendant's argument was that since, admittedly, whoever sent the pills through the mail intended to do so, that no evidence to prove intention or motive was admissible. The trial court reasoned that to allow a defendant to admit intent on the part of some party (not defendant) and thus be able to bar the evidence would make the statute rather nonsensical.

The trial judge's conclusion has support in Michigan case law. In *People v Neaton,* 294 Mich 134, 142; 292 NW 589 (1940) this Court held:

"By the great weight of authority, the prosecuting attorney was not precluded from introducing evidence in the regular way to establish all the material facts and circumstances set forth in the information, and he is not precluded from so doing by any admissions made by defendant or his attorney."

Defendant by making bald admissions that someone intended to do the act could not shut out evidence by the prosecution that tended to show that defendant was the one who intended to do the act. Intent was in issue. Murder involves intent. *People v Giacalone,* 242 Mich 16; 217 NW 758 (1928). It was a material and relevant element in

---

[4] Both experts testified that the handwriting on the pill wrapper and package wrapper and other writing specimens of defendant matched. That is, they were all written by one and the same person.

the instant case. Thus the cases cited by defendant are inapposite.

The general proposition that the motive or intent of the defendant may be shown by prior acts, even though these acts would constitute commission of another crime is supported by numerous cases.[5]

The testimony of the handwriting experts linked defendant with the poison pills. That is, it was defendant's act in sending the pills. This act was then admissible to show the intent to murder.

We hold that the trial judge did not err in allowing the pill bottle and wrapper into evidence for the purposes of establishing defendant's intention of doing away with the deceased.

B. *Was it reversible error for the trial judge not to give a cautionary instruction as to the limited admissibility of the evidence where no such instruction was requested?*

Defendant claims that even if this evidence was admissible, it was reversible error for the trial judge not to limit its purpose and use, in the minds of the jury, to the question of intent.

However, defendant never requested a cautionary instruction, nor did he object to the instructions as given. He claims, nevertheless, that it was the duty of the trial judge to give a limiting instruction even in the absence of a request. He

---

[5] *See, for example: People v Nawrocki,* 376 Mich 252; 136 NW2d 922 (1965) (passing of other bad checks); *People v Allen,* 351 Mich 535; 88 NW2d 433 (1958) (proof of previous safe-breaking); *People v Johnston,* 328 Mich 213; 43 NW2d 334 (1950) (other acts of bribery and conspiracy); *People v Wright,* 315 Mich 81; 23 NW2d 213 (1946) (proof of previous holdup as evidence of intent to rob); *People v Fleish,* 306 Mich 8; 9 NW2d 905 (1943) (other instances of receiving stolen property).

cites the dicta of Judge O'HARA in *People v Kelly,*
26 Mich App 148; 182 NW2d 8 (1970).[6]

Our Court of Appeals has split on this issue even
after the definitive Supreme Court ruling in *People v Nawrocki,* 376 Mich 252; 136 NW2d 922
(1965). See *People v Harper,* 39 Mich App 134, 137;
197 NW2d 338 (1972).[7] *Kelly* held that while it
may be preferable for the trial judge to give an
instruction at the time of the introduction of the
evidence there is no reversible error if the judge
includes such an instruction in the final charge.[8]
But *Nawrocki* goes even further and holds that the
trial judge is not required to give any limiting
instruction *sua sponte.*

Here no instruction was ever requested by de-
fendant nor did he offer objection to the final
charge to the jury. As a result, no cautionary
instruction was ever given. We hold that in the
absence of request or proper objection under pres-
ent Michigan case law, there is no absolute re-

---

[6] Judge O'HARA after discussing the other Court of Appeals cases
stated:

"We hold failure in this case to give instruction *immediately* upon
admission of the testimony was not reversible error. We hold not to
give the instruction at all, whether requested or not, *is* reversible
error." 26 Mich App 148, 159.

In the Supreme Court, *People v Kelly,* 386 Mich 330; 192 NW2d 494
(1971), Judge O'HARA's dicta was not repeated and the affirmation of
the Court of Appeals with this dicta only noted there was a final
covering instruction.

[7] For cases requiring instruction though no request see: *People v
Askar,* 8 Mich App 95, 101; 153 NW2d 888 (1967); *People v Shaw,* 9
Mich App 558, 566; 157 NW2d 811 (1968); and *People v Camel,* 11
Mich App 219, 222; 160 NW2d 790 (1968).

For cases not requiring instruction if no request see: *People v
Manchester,* 235 Mich 594, 595–596; 209 NW 815 (1926); *People v
Anderson,* 13 Mich App 247, 250; 163 NW2d 793 (1968); *People v
Mauch,* 23 Mich App 723, 728; 179 NW2d 184 (1970); *People v
Stevens,* 25 Mich App 181, 183; 181 NW2d 31 (1970); *People v Albert
White,* 27 Mich App 432, 434; 183 NW2d 606 (1970); and *People v
McGath,* 31 Mich App 351, 359; 187 NW2d 904 (1971).

[8] The Supreme Court has under consideration a General Court Rule
to cover this whole matter.

quirement that the trial judge give limiting instructions, even though such an instruction should have been given.

Therefore failure to instruct in this case where there was no request for such instruction and no objection to the failure to instruct was not reversible error.

## IV. SEARCH AND SEIZURE

Defendant was arrested on October 11, 1967. On request by the police after arrest, he signed on the morning of that date a consent that his home be searched as follows:

"I, *Enoch D. Chism,* [Signed] having been informed of my constitutional right not to have a search made of the premises hereinafter mentioned without a search warrant, and of my right to refuse to consent to such a search, hereby authorize M. L. Myers, Post Office Inspector, and Leroy Steinbacher, of the Michigan State Police Dept., to conduct a complete search of my residence located at 14969 C Drive North & the curtilage & 1964 Ford Fairlane & 1965 Pontiac. The above named are authorized by me to take from my residence any letters, papers, materials or other property which they may desire.

"This written permission is being given by me to the above named voluntarily and without threats or promises of any kind.

"(Signed) Enoch Chism"

Prior to signing the consent he was fully advised of his rights via the "Miranda" warning.[9] About 10

---

[9] "*Q.* And according to your best recollection, Mr. Wood, what was the defendant advised as to his Constitutional rights?

"*A.* He was told that of course, he was under arrest, that he had the right to remain silent, he had the right to have a lawyer present anytime that he was questioned, and if he could not afford a lawyer, a lawyer would be appointed to advise him. He was advised that anything that he might say could be used against him in any Court

a.m. that morning his home was searched by a team of officers. Just prior to the commencement of the search the officers also obtained a written consent to search from defendant's wife.[10] They then found and removed a roll of masking tape, a red marking pencil, and a Fiske "C" battery.

On the next day, October 12, 1967, at about 4 p.m., two police officers returned to the defendant's home and requested that defendant's wife turn over to them certain cancelled checks of defendant and his daily record book. They had no search warrant. These items had been discovered the day before in the search but were not seized. Mrs. Chism produced and delivered the items without comment.

A motion to suppress the fruits of these searches was denied December 10, 1969. The defendant raises the following several related arguments as to both of these incidents.

### A. *Validity of Defendant's October 11 Consent*

Defendant argues that his consent was ineffectual, even though the Miranda warnings were given, because he was not advised that a search could not be made without his consent unless a warrant was issued, that an impartial magistrate must issue the warrant, and of the difference in scope between a warrant search and a consent search.

Generally speaking, a warrantless search and

---

proceedings, and that he had the right to stop our asking questions at any time he chose."

Hearing on Suppression of Evidence September 18, 1969, p 4.

[10] "10-11-67

"I Bernice Chism give my permission to Sgt Fred L Ritchie and other law enforcement officers to search my house located at 14969 C Drive N. Also my Vehicle 1965 Pontiac license #PR4839.

"Bernice Chism" [Signed]

seizure is unreasonable per se and violative of the
Fourth Amendment of the United States Constitu-
tion and 1963 Const, art 1, § 11 of the state consti-
tution.

However, it is quite clear that the right to be
secure from warrantless searches may be waived
by defendant's valid consent. *Martucci v Detroit
Commissioner of Police,* 322 Mich 270; 33 NW2d
789 (1948). We said in *People v Kaigler,* 368 Mich
281, 294; 118 NW2d 406 (1962):

"[S]uch waiver or consent must be proved by clear
and positive testimony *and there must be no duress or
coercion, actual or implied, and the prosecutor must
show a consent that is unequivocal and specific, freely
and intelligently given."* (Emphasis in original case.)

Whether a consent is valid is a matter of fact
based upon the evidence and all reasonable infer-
ences to be drawn from it.[11] The trial judge, exer-
cising his discretion, found that the consent was
valid. We hold that his decision was not clearly
erroneous.

In *People v Zeigler,* 358 Mich 355, 364–365; 100
NW2d 456 (1960) this Court stated:

"And so, with respect to incriminating evidence,
other than confessions, obtained by search and seizure,
under a conceivable showing of facts, such as, *inter alia,*
that the accused was first advised of his rights, in-
formed that he need not submit to a search and that, if
he did, the fruits thereof would be used in evidence
against him, his consenting to the search and seizure
may well, in the absence of contrary indications, be
held to be voluntary, not an involuntary act secured
under coercion, and, hence, a waiver of his constitu-
tional rights, rendering such evidence admissible."

---

[11] Mascolo, *Inter-Spousal Consent to Unreasonable Searches and
Seizures: A Constitutional Approach,* 40 Conn BJ 351, 357 (1966).

As stated above, the defendant was given the Miranda warnings informing him of his rights. He stated that he understood these rights.[12]

Further, the written consent verifies that defendant was informed of his "constitutional right not to have a search made of the premises hereinafter mentioned without a search warrant" and of his "right to refuse to consent to a search."[13]

Defendant was informed as to the purpose of the search and that the fruits of the search might be used against him in evidence.[14] The record is also replete with evidence that the consent was freely, voluntarily, and unequivocally given with no hint of coercion or duress.[15]

---

[12] Hearing on Motion to Suppress, September 18, 1969, p 4–5.

[13] Though the record shows that the defendant was not informed of the role of a search warrant, he was made fully aware by the prosecutor that he did not have to consent to the search and that he had every right to refuse if he was so inclined. Hearing on Suppression of Evidence, September 18, 1969, p 133.

All *Zeigler* requires is that the defendant be informed that "he need not submit to a search". It does not require a fine explanation of the role of search warrants. See *Consent Searches: A Reappraisal after Miranda v. Arizona,* 67 Colum L Rev 130, 132, fn 14 (1967).

[14] In response to a prosecution question to a police officer as to what defendant had been advised of the officer replied:

"As I recall, you [the prosecutor] advised him that anything that was found as a result of this search would be used against him in evidence, and he consented. He said he had nothing to hide from anybody, * * * ." Final Hearing on Motion to Suppress, November 13, 1969, p 5.

"*Q.* Did you tell him why [you wanted to go out and search his home]?

"*A.* Yes.

"*Q.* What reason did you give him?

"*A.* We told him we wanted to look for items that could be used in construction of a device.

"*Q.* And his response was what?

"*A.* He had nothing to hide.

\* \* \*

"*Q.* You made no mention of looking for any handwriting?

"*A.* Not as I recall, no sir."

Final Hearing on Motion to Suppress, pp 9, 11.

[15] The following questions and answers depict a scene free from coercion:

As to this first search, the wife's consent was

---

"*A.* We offered him coffee * * * , and he refused.

\* \* \*

"*Q.* Was the defendant handcuffed?
"*A.* Not when we interrogated, no sir, interviewed him.
"*Q.* Were any weapons displayed?
"*A.* No sir.

\* \* \*

"*Q.* Do you know of any deceit or trickery practiced on the defendant to get his consent?
"*A.* No sir."

\* \* \*

Final Hearing on Motion to Suppress, pp 8, 13.
"*Q.* Did this conversation take place in a cell or where?
"*A.* It took place at where I believe is set aside as the Sheriff's living quarters in the Second Floor of the County jail.

\* \* \*

"*Q.* Was any law enforcement officer in uniform present?
"*A.* No, sir.
"*Q.* What did you ask defendant specifically, whether you could go out to his home and search the premises?
"*A.* Yes, we did.
"*Q.* How many times did you ask him?
"*A.* We asked him once.
"*Q.* Do you remember what his response was?
"*A.* His response was that we certainly could; he had nothing to hide.

\* \* \*

"*Q.* Do you recall what his response was at the time when you asked him, 'Would you talk to us about it?'
"*A.* He said he would talk to us about it, yes.
"*Q.* Did you proceed to discuss the various aspects as known to the police to Mr. Chism?
"*A.* Yes.
"*Q.* Did Mr. Chism at that time respond to the questions?
"*A.* Yes, sir.
"*Q.* Did he have any difficulty in responding to the questions?
"*A.* No.
"*Q.* Did he accept the questions and answer them freely and voluntarily?
"*A.* Yes, sir.
"*Q.* Did Mr. Chism at any time by word or deed or anything, or any expression, indicate he was being coerced in any manner?
"*A.* No, sir.
"*Q.* Was he crying?
"*A.* No.

irrelevant due to the valid consent of the defendant and we need not pass upon its validity. Thus the consent was valid and the evidence seized on October 11, 1967 was admissible.[16] The trial judge committed no error.

## B. *Validity of the October 12 Seizure of the Checks and Notebook*

### 1. Did the defendant's valid consent of October 11 carry over to authorize the seizure on October 12?

On October 12, 1967, Fred Ritchie of the Calhoun County Sheriff Department and Detective Leroy Steinbacher of the Michigan State Police returned to the Chism home. Mrs. Chism was at

---

"*Q.* Did he show any signs of emotional symptoms?

"*A.* None, except he appeared to be somewhat nervous.

"*Q.* Was he extremely excited?

"*A.* No, sir."

Hearing on Motion to Suppress, September 18, 1969, pp 132–136.

And also when defendant testified at trial he portrayed a coercion free atmosphere:

"*Q.* While I am on that line of questioning, Mr. Chism, I show you Exhibit 37, did you sign that voluntarily?

"*A.* Yes sir, they asked me could they search my home and car, they said it would be necessary for me to sign this paper for those officers in my presence to search my home.

"*Q.* So you voluntarily consented to that, signed that authorization?

"*A.* I signed it authorizing the people in my presence to search my home. I didn't authorize the State of Michigan to go through my home.

"*Q.* What do you mean by that?

"*A.* These officers seemed like they were awful, pretty nice people, they asked me could they search my home, I said I didn't care if they searched my home."

[16] For a textual treatment of the law of consent to searches and seizures see:

Tiffany, McIntyre, and Rotenberg, *Detection of Crime: Stopping & Questioning—Search & Seizure—Encouragement & Entrapment* (Little, Brown, and Co ed 1967), ch 10, pp 156–170; and Varon, *Searches, Seizures & Immunities* (Bobbs-Merrill ed 1961), ch 4, pp 226, 232 *et seq.* and ch 8, pp 414, 429–450.

home and admitted the officers into the house.
They told Mrs. Chism that there was a notebook of
defendant's and some of his cancelled checks that
they would like to have. They told her these items
were in the bedroom. (On the previous day's
search one of the officers had found a notebook of
defendant's and some of his cancelled checks in
the bedroom in a drawer but had failed to seize
them. The officer then informed Officer Ritchie of
this fact after they had left the house.) Officer
Ritchie then asked if Mrs. Chism would get those
specific items and turn them over. Mrs. Chism
then left the room and returned with the items to
the waiting officers.[17]

The Court of Appeals declined to hold that the
consent given by defendant for the October 11
search was sufficient to render constitutional the
seizure the following day. It stated:

"When consent is given to search an area, it does not
mean the constitutional protection against unreasona-
ble searches and seizures has been waived forever.

"Indeed, we think there is a difference between a
continuing or subsequent search on the same day as in
*People v Nawrocki* (1967), 6 Mich App 46 [150 NW2d
516], *cert den* 389 US 942 (88 S Ct 304, 19 L Ed 2d 296
[1967]), and one on a subsequent day. Thus, the check-
book and notebook seized in the second search were
improperly seized and not admissible as evidence. *Mapp
v Ohio* (1961), 367 US 643 (81 S Ct 1684, 6 L Ed 2d
1081, 84 ALR2d 933)." 32 Mich App 610, 632.

In deciding whether this second seizure resulted
in admissible evidence, the actual scope of the
written consent must be determined. The consent,
freely and voluntarily made by defendant, autho-
rized Detective Leroy Steinbacher of the Michigan

_____
[17] Hearing on Suppression of Evidence, September 18, 1969, pp 19,
24–28, 97–98.

State Police and the Postal Inspector M. L. Myers "to conduct a complete search of my residence * * * to take from my residence any letters, papers, materials or other property which they may desire."

Although defendant was not informed that handwriting samples would be looked for, he was informed that anything found as a result of the search would be used against him in evidence. Defendant's reply to this was that he had nothing to hide. Thus the officers went to the house on October 11 with the purpose of finding something that would be pertinent to the crime.

Therefore the consent was broad in the sense that it "authorized a complete search * * * of any * * * property." The items seized on October 12 had been found in the search on October 11 and could have then been seized. There was no general search on October 12 as the officers knew where the items were to be found. The officers were merely completing the search which had begun on the previous day. The defendant's consent, under these narrow facts, might be construed to be broad enough to authorize the seizure on October 12, but it is unnecessary for this Court to so hold, because it is clear that the wife had the power to consent to, and did consent to, the second search.

## 2. Could defendant's wife consent to the seizure of October 12?

When the officers returned on October 12, they asked the wife if she would get the checks and the notebook which had been seen on the previous day's search in the bedroom. She did so with little or no conversation with the officers.

Defendant argues that his wife could not waive

his rights by delivering the specified items to the police officers. The Court of Appeals did not base their decision of the seizure issue on the wife's consent.[18] Following *People v Flowers,* 23 Mich App 523; 179 NW2d 56 (1970) the Court of Appeals stated in dicta that the wife was an outsider and could not waive the right of a charged party. 32 Mich 610, 631.

There is no Michigan case directly in point. In *People v Weaver,* 241 Mich 616; 217 NW 797 (1928), the question was whether the constitutional right of the defendant wife to immunity from the unreasonable search of her home, one owned by her, may be waived by her husband. In holding that the evidence obtained in the search should have been suppressed, the Court stated:

"Defendant [wife] owned this property, was there conducting a boarding and rooming house, and, so far as this record discloses, was supporting herself. * * * To hold that the waiver signed by her husband nearly two years before prevents her from here asserting her constitutional rights would place such rights into the care and keeping of the husbands of all the married women of the state." 241 Mich 616, 623.

In *People v Azukauckas,* 241 Mich 182; 216 NW 408 (1927) the question was whether defendant, a bootlegger, could object to a warrant where the householder to whom liquor had been delivered as part of a sale did not. Certain Court of Appeals cases relied on by defendant will be considered later. Both of these cases are distinguishable on the facts from the instant case.

Authority in other states is widely split on the question of whether a wife can consent to a search

---

[18] The Court of Appeals stated:

"The wife's consent can be said to have neither added to nor detracted from the search." 32 Mich App 610, 631.

of the husband's premises and a seizure of his property.[19]

The United States Supreme Court has not yet passed on this particular question. In *Amos v United States,* 255 US 313, 317; 41 S Ct 266; 65 L Ed 654 (1921), the Supreme Court held that a wife could not consent to a search of her husband's premises when the consent was a product of coercion. It stated:

"We need not consider whether it is possible for a wife, in the absence of her husband, thus to waive his constitutional rights, for it is perfectly clear that under the implied coercion here presented, no such waiver was intended or effected."[20]

An additional highly relevant factor in this case is that at the time of the search and seizure, the defendant and his wife owned the property jointly.[21] This leads to the question of whether persons with at least equal interests in the premises or property with the one asserting the constitutional immunity against unreasonable searches and seizures may consent to a search of such premises or property notwithstanding the husband-wife relationship.[22]

---

[19] *See* 31 ALR2d 1078, 1091. *See also* Hall, Kamisar, LaFave and Israel, *Modern Criminal Procedure* (West ed 1969), ch 5, pp 295–296; Mascolo, *Inter-Spousal Consent to Unreasonable Searches & Seizures: A Constitutional Approach,* 40 Conn BJ 351 (1966); and Varon, *supra,* pp 430–432.

[20] *See People v Kaigler,* 368 Mich 281; 118 NW2d 406 (1962) for a situation involving explicit coercion.

[21] "*Q.* Do you own any real estate?

"*A.* Her and I own it together."

Hearing on Appointment of Counsel, October 18, 1967, p 4.

A similar exchange took place at a second appointment of counsel hearing on October 27, 1967. The exchange, at p 5, proceeded:

"*Q.* Now, how did you own the property in question?

* * *

"*A.* We owned it jointly."

[22] Several jurisdictions have allowed persons to consent to searches

## There are four recent cases in which the United

of property or premises which they owned or had equal rights in as to use or occupation. See 31 ALR2d 1079, 1080, 1086.

| | |
|---|---|
| ARKANSAS | *Maxwell v State,* 236 Ark 694; 370 SW2d 113 (1963). (Held that a parent could consent to a search of the premises owned by him even if the search resulted in the seizure of incriminating evidence as to their children.) |
| COLORADO | *Spencer v People,* 163 Colo 182; 429 P2d 266 (1967). (Owner of the premises may consent to a search of defendant roomer's bedroom.) |
| DELAWARE | *Jenkins v State,* 230 A2d 262 (Del, 1967); aff'd 395 US 213; 89 S Ct 1677; 23 L Ed 2d 253 (1969). (Where a lessee and defendant are joint occupants, the lessee as the sole legal occupant had superior rights of possession and control and could give consent to a search of the premises including a jointly shared bedroom.) |
| FLORIDA | *Tomlinson v State,* 129 Fla 658; 176 So 543 (1937). (Search of son's bedroom in father's house with his consent, which resulted in evidence used against child, was lawful.) |
| IDAHO | *State v Hagan,* 47 Idaho 315; 274 P 628 (1929). (Search of barn on mother's premises with her consent was lawful where defendant's possession of the barn was in subservience and submission to the power, authority, ownership and possession of the mother.) |
| ILLINOIS | *People v Shambley,* 4 Ill 2d 38; 122 NE2d 172 (1954). (Where a house is jointly owned and occupied by a husband and wife, the wife can in her own right have the police come into the home and search for the weapon the husband had used to assault her. The weapon was found in the garage.) |
| INDIANA | *Shade v State,* 196 Ind 665; 149 NE 348 (1925). (The owner of land can give permission to police to go onto the land and search for violations of the prohibition law.) |
| KENTUCKY | *Morris v Commonwealth,* 306 Ky 349; 208 SW2d 58 (1948). (Head of the household or the one in charge of the premises may consent to a search. The evidence was found in the kitchen.) |
| MAINE | *State v MacKenzie,* 161 Me 123; 210 A2d 24 (1965). (Tenant could consent to a search of |

States Supreme Court has considered the matter

| | |
|---|---|
| | the premises which leads to evidence against the defendant.) |
| MARYLAND | *McGuire v State,* 200 Md 601; 92 A2d 582 (1952), *cert den* 344 US 928; 73 S Ct 497; 97 L Ed 714 (1953). (Manager of an apartment and lessee of apartment could consent to search in which evidence against defendant was found in the apartment and the defendant was a mere interloper who had no interest in the premises.) |
| MICHIGAN | *People v Azukauckas,* 241 Mich 182; 216 NW 408 (1927). (The householder could consent to a search of premises he owned. The property seized was not owned by defendant. The barn the property was seized in was not in the exclusive use or possession of defendant.) |
| MINNESOTA | *State v Kinderman,* 271 Minn 405; 136 NW2d 577 (1965); *cert den* 384 US 909; 86 S Ct 1349; 16 L Ed 2d 361 (1966). (Defendant's father who owned home could consent to search of son's bedroom.) |
| MISSISSIPPI | *Gordon v State,* 160 So 2d 73 (Miss, 1964). (Stepfather's consent to the search of his premises lawful and the police could enter and seize defendant stepson who was hiding there as well as items of evidence.) |
| MISSOURI | *State v Anderson,* 384 SW2d 591 (Mo, 1964). (Parent-child consent held right to consent is a personal one to the parent renter of the property.) |
| NEW YORK | *People v Austin,* 53 Misc 2d 963; 280 NYS2d 433 (1967). (Defendant's mother who owned home where he lived, but didn't pay rent, could consent to a search of the cellar over which he had no exclusive use or control and contraband seized there was admissible against defendant.) |
| NORTH CAROLINA | *State v Fowler,* 172 NC 905; 90 SE 408 (1916). (Sisters of defendant who were in charge of the premises where defendant also lived could consent to a search of the premises.) |
| OHIO | *State v Carder,* 9 Ohio St 2d 1; 222 NE2d 620 (1966). (Parent who owns or controls home in which child resides can consent to search of premises.) |
| OREGON | *State v Broadhurst,* 184 Or 178, 250–251; 196 P2d 407 (1948), *cert den* 337 US 906; 69 |

of consent to search by some one other than the
defendant but a person who has some proprietary
interest in the place and sometimes in the object
searched or searched for. *Chapman v United
States,* 365 US 610; 81 S Ct 776; 5 L Ed 2d 828
(1961); *Stoner v California,* 376 US 483; 84 S Ct
889; 11 L Ed 2d 856 (1964); *Bumper v North
Carolina,* 391 US 543; 88 S Ct 1788; 20 L Ed 2d

|                  |                                                                                                                                                                                        |
|------------------|----------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------|
|                  | S Ct 1046; 93 L Ed 1718 (1949). (Relatives to whom owner had given use and occupancy of home could invite in the police to search owner defendant's room.)                              |
| PENNSYLVANIA     | *Commonwealth v McKenna,* 202 Pa Super 360; 195 A2d 817 (1963). (Defendant's mother may consent to search of premises which she owns and where defendant lives.)                        |
| RHODE ISLAND     | *State v Cairo,* 74 RI 377; 60 A2d 841 (1948). (Search of cellar used in common by defendant and his wife and owned jointly by defendant and wife could be consented to by the wife.)   |
| TENNESSEE        | *McGee v State,* 451 SW2d 709 (Tenn Crim App, 1969). (Joint user of premises may consent to a search. Defendant lived at premises as a member of the family though in fact he was not and the family could consent to the search.) |
| TEXAS            | *Nagel v State,* 126 Tex Crim 265; 71 SW2d 285 (1934). (One who has no right of ownership or control in premises can't complain of search permitted by owner.)                          |
| VIRGINIA         | *Rees v Commonwealth,* 203 Va 850; 127 SE2d 406 (1962); *cert den* 372 US 964; 83 S Ct 1088; 10 L Ed 2d 128 (1963). (Parents of defendant could consent to a search and gun found in the attic could be used against defendant who did not regularly live in the house.) |
| WEST VIRGINIA    | *State v Plantz,* — W Va —; 180 SE2d 614 (1971). (Search of grandparent's house where defendant had lived temporarily, based on their consent was valid since the grandparents owned and controlled the premises.) |
| WISCONSIN        | *Embry v State,* 46 Wis 2d 151, 159; 174 NW2d 521 (1970). (Two persons with equal rights to use or occupancy of premises may each give consent to a search of the premises.) |

797 (1968); *Frazier v Cupp,* 394 US 731; 89 S Ct 1420; 22 L Ed 2d 684 (1969).

These four cases along with *Amos, supra,* establish four guidelines, two of which are pertinent in the instant case:

1. If the search is coerced, the search and its fruits are illegal whatever the other circumstances are. *Bumper, supra,* and see also *Amos, supra.*

2. An owner may not give consent to search premises of a tenant unless contractually provided for. *Chapman, supra,* and *Stoner, supra.*

3. An owner may give consent to search of a room in a house which is commonly used and not the part of the house assigned to defendant, particularly if the object of the search is also commonly used. Dicta in *Bumper, supra.*

4. The owner of a house may give consent to search a container (a duffel bag) jointly used by the owner and the defendant and left in the householder's house. *Frazier, supra.*

In *Bumper v North Carolina,* 391 US 543; 88 S Ct 1788; 20 L Ed 2d 797 (1968), the Supreme Court dealt with the problem of a consent given under coercive circumstances. In this case, petitioner lived with his grandmother in a house owned by her. She also owned the rifle that was seized. The Court left no doubt that the grandmother, in the absence of coercion, could have consented to the search. It stated:

"Mrs. Leath owned both the house and the rifle. The petitioner concedes that her voluntary consent to the search would have been binding upon him. * * * The rifle was used by all members of the household and was found in the common part of the house." 391 US 543, 548, fn 11.

Mr. Justice Black, dissenting, was at least in

agreement that the grandmother could (and *he* thought, in fact *did)* voluntarily consent to the search. He stated:

"Mrs. Leath's voluntary consent was sufficient to validate the search since she owned the house which was searched and the rifle that was taken. It should also be noted that the rifle was not found in petitioner's private room, nor in any part of the house assigned to him, but in the kitchen behind the door." 391 US 543, 556, fn 4.

And in *Frazier v Cupp,* 394 US 731; 89 S Ct 1420; 22 L Ed 2d 684 (1969), the Supreme Court discussed the joint right to use. Here the Court held that evidence seized from petitioner's duffel bag was admissible even though consent to search the duffel bag had been given by his cousin Rawls. Justice Marshall stated:

"This duffel bag was being used jointly by petitioner and his cousin Rawls and it had been left in Rawls' home. * * * Since Rawls was a joint user of the bag, he clearly had authority to consent to its search. * * * Petitioner, in allowing Rawls to use the bag and in leaving it in his house, must be taken to have assumed the risk that Rawls would allow someone else to look inside." 394 US 731, 740.[23]

The case at bar does not involve coercion. The wife had freely consented the day before to a search of the house. The two officers who returned on October 12 behaved with perfect courtesy. They did not intimidate the wife into allowing another

[23] The United States Supreme Court in *Coolidge v New Hampshire,* 403 US 443; 91 S Ct 2022; 29 L Ed 2d 564 (1971) was again faced with the wife waiver problem, but never reached the issue as they held that there had been no search and seizure within the protection of the Fourth Amendment. *Coolidge* also involved two searches. During the first the husband in the presence of the wife produced three guns. Later to different officers the wife showed four of her husband's guns *without being asked to do so* as Mrs. Chism had been in our case.

exploratory search. Rather, they politely asked for two specific items which had been seen the day before and informed the wife where they could be found.

In the instant case the wife was a joint owner of the house to be searched, a joint occupant as well as a joint owner of the bedroom where the objects seized were to be found and the checks were from a jointly handled checking account in the wife's name alone. Thus, it could be said that defendant "assumed the risk" that his wife would turn over the particular items.[24] Certainly under the rule in *Frazier* and the dicta in *Bumper* the wife could give consent to search, or as actually happened herself pick up and hand over the checks. The

[24] In *Stoner,* the United States Supreme Court stated that Fourth Amendment rights were "not to be eroded by strained applications of the law of agency or by unrealistic doctrines of apparent authority" nor by " 'subtle distinctions, developed and refined by the common law * * * .' " 376 US 483, 488. In *Warden v Hayden,* 387 US 294, 304; 87 S Ct 1642; 18 L Ed 2d 782 (1967), the Court in discussing the Fourth Amendment stated:

"We have recognized that the principal object of the Fourth Amendment is the protection of privacy rather than property, and have increasingly discarded fictional and procedural barriers rested on property concepts."

A different thread of reasoning, "assuming the risk" as stated in *Frazier* was followed in the earlier cases of *Lopez v United States,* 373 US 427, 439; 83 S Ct 1381; 10 L Ed 2d 462 (1963) and *Hoffa v United States,* 385 US 293; 87 S Ct 408; 17 L Ed 2d 374 (1966). As the Court stated in *Hoffa:*

"Neither this Court nor any member of it has ever expressed the view that the Fourth Amendment protects a wrongdoer's misplaced belief that a person to whom he voluntarily confides his wrongdoing will not reveal it." 385 US 293, 302.

And in the dissenting opinion in *Lopez,* as to the matter of misplaced trust, it was said, "It is the kind of risk we necessarily assume * * * ." 373 US 427, 465.

This line of reasoning in *Hoffa* and *Lopez* "remained unaffected by *Katz.*" *United States v White,* 401 US 745, 749; 91 S Ct 1122; 28 L Ed 2d 453 (1971). That is, the theory of a justifiable reliance of privacy, in *Katz v United States,* 389 US 347; 88 S Ct 507; 19 L Ed 2d 576 (1967), did not preclude situations in which a person relinquished his right of privacy by "assuming the risk" that someone else he had confided in, either in keeping secrets or sharing property, would divulge the secret or property to someone else.

notebook the wife picked up was in the same bedroom and its delivery was covered by the rule in *Frazier* and all of the dicta in *Bumper* except that in the case of the notebook, it is not as clear as in the case of the checks that the notebook was jointly controlled. There is some evidence tending in that direction, and none tending toward exclusive control by the defendant. In any event the rule in *Frazier* does not require that the object searched for be jointly owned. In the dicta in *Bumper* it was merely observed that the object searched for was owned by the householder giving consent, obviously strengthening the case but not necessarily making it critical.

The defendant relies on three Michigan Court of Appeals cases to support his position that his wife could not consent to the second seizure. In *People v Overall,* 7 Mich App 153; 151 NW2d 225 (1967), the Court of Appeals ruled that the grandmother of the defendant who owned the premises where defendant resided could not authorize a search of the bedroom in that home occupied by the defendant. The Court held that the gun barrel seized was not admissible in evidence.

The facts of *Overall* are clearly distinguishable from the instant case in that there the room was exclusively occupied by defendant in *Overall,* whereas in the instant case there was joint occupancy. Likewise in *Overall* there is no question of joint ownership of the objects searched for and seized.

In *People v Smith,* 19 Mich App 359; 172 NW2d 902 (1969), the investigating officers went to the home of the defendant looking for him, were admitted by his brother, also a resident of the apartment, and testified that the brother voluntarily showed them through the apartment, produced a

spent shell from a wastebasket, and on the second
visit a few hours later, asked for and received a
box of unused shells. Both the spent and unused
shells were admitted into evidence. The Court per
Justice LEVIN, then a Court of Appeals Judge, in a
well reasoned opinion held that the consent was
invalid and the seized evidence inadmissible. Then
Judge LEVIN analyzed the totality of the situation
relying on such factors as 1) the brother was not
informed of the purpose of the search; 2) the
brother was not advised that he could refuse to
permit a search; 3) the coercive atmosphere in
which the search took place; 4) the fact that the
apartment was defendant's and that he paid the
rent and was supporting his brother; and 5) the
consent given was not a knowing, freely-given,
voluntary consent.

Our case is quite different from *Smith* on the
facts. First, the wife had seen the consent signed
by the defendant giving permission for a general
exploratory search. Since her husband had been
jailed on a charge of murder, she knew that the
search's purpose would be to find any evidence
which might implicate him in the murder. She
also had been present at the search the day before.
The atmosphere of the seizure was free from coer-
cion and took place in a house which was half-
owned by the wife. There is no evidence that she
did not consent freely, knowingly and voluntarily
to the search on the previous day.

In *People v Flowers,* 23 Mich App 523; 179
NW2d 56 (1970), the Court of Appeals dealt with
parental consent to the search of their 17-year-old
son's room. The father was advised of the purpose
of the search (to find narcotics). There was no
coercion, and consent was given. Narcotics were
found in the son's bedroom. The son was being
supported by the father. The Court found that

though the consent was valid in that there was no coercion and that it was freely and voluntarily given, the father had no personal right to give the consent as he was merely an outsider.

*Flowers* is distinguishable from the instant case in the same way as *Overall.* A private rather than a shared room was searched. The defendant's property rather than jointly owned property was the object of the search.

Therefore, based on the totality of facts and circumstances, on balance we conclude that the wife could and did consent to get the two items requested by the police and deliver these items to them. She had knowledge from the previous day what the purpose of the search was. She was not coerced in any way. She knew that her husband had signed a waiver. We think her consent was freely, knowingly and voluntarily given. She had joint use and control of the house which extended to the bedroom where the items were found. Further there is no evidence that defendant exercised exclusive control or possession over those items seized on October 12. For a similar conclusion see *Carlton v State,* 111 Fla 777; 149 So 767 (1933); *State v Cairo,* 74 RI 377; 60 A2d 841 (1948); *People v Shambley,* 4 Ill 2d 38; 122 NE2d 172 (1954); and *Embry v State,* 46 Wis 2d 151; 174 NW2d 521 (1970).[25]

---

[25] In *Carlton,* the police went to defendant's house to further their investigation. Defendant was at home and consented to the search of the house. Defendant was then taken to jail. On the next day the police returned to the home and with the consent of and in the presence of defendant's wife, made a second search. The Florida Supreme Court held that, "[p]iecing the whole procedure together," there was no violation of defendant's search and seizure right. The Court relied on the defendant's consent, the conduct of the police, and the presence and consent of the wife. The Court found that this set of circumstances was not controlled by the general rule that a wife cannot consent to a search of premises owned by her husband without his permission.

### C. *Conclusion as to Search and Seizure*

The evidence seized on October 11 and on October 12 was admissible.

## V. SUMMARY

There was no denial of the right to speedy trial. The introduction of evidence of previous acts to establish intent was not error, nor was it error by the trial court to fail to give a limiting instruction as to this evidence when none was requested. Last, the evidence seized on October 11 and 12 was admissible. The Court of Appeals is affirmed.

T. M. KAVANAGH, C. J., and T. E. BRENNAN, and SWAINSON, JJ., concurred with WILLIAMS, J.

---

Our case is even stronger since the wife was a joint owner and user of the house.

In *Cairo*, the Supreme Court of Rhode Island considered the wife consent problem. Here, the wife was a joint owner of the two-family dwelling along with the defendant husband. She gave police her consent to search the home. A search of the cellar, used in common by both families, revealed a bag of tools used in the break-in of the store and three faucets similar to those taken from the store. In upholding this search and seizure, the Court stated the wife could consent in her own right as a joint owner and occupant of the premises. Further, the Court relied on the fact that the evidence was seized in a portion of the house over which defendant did not have exclusive use and control.

In *Shambley*, defendant was convicted of assaulting his wife with a deadly weapon *(i.e.,* a gun). The assault took place in the home jointly owned by defendant and his wife. After defendant's arrest, the wife gave her consent for the officers to search the house for the gun. It was found in the garage. The Court held this evidence admissible following the rule that where two persons have equal rights to the use or occupation of premises, either may give consent to a search and the evidence thus disclosed can be used against either. Again, the wife was acting in her own right and the evidence was found in a part of the house used by both defendant and his wife.

In *Embry* the two defendants had embarked together on a forgery adventure. The Court upheld evidence found in a search of a car and trailer rented by one of the defendants in furtherance of the scheme. This defendant consented to the search. The Court held the evidence admissible against both defendants as they were acting together in this forgery venture and thus had equal rights to use of the car and trailer.

## APPENDIX A

[  ] indicate appellate action

*1967*

10/11    Defendant arrested and incarcerated without bail.

10/18    Defendant petitioned for counsel as indigent—hearing thereon.

10/27    Further hearing on petition for counsel as indigent.

11/16    Preliminary examination with special counsel appointed therefor. Bound over to stand trial for murder.

12/26    Further hearing on petition for counsel as indigent.

*1968*

1/9    Trial court held defendant not entitled to counsel as indigent.

1/12    Order on above.

1/18    Counsel appointed to appeal 1/12 order denying counsel.

C Ap 2/10    [Counsel filed application for leave to appeal.]

C Ap 3/29    [Leave granted; also leave to Prosecuting Attorneys Association to intervene amicus.]

[Order cutting time for briefs in half.]

[Because Court of Appeals rules against oral argument before October term appellant and prosecutor filed stipulation waiving oral argument.]

C Ap 7/1    [Defendant's appeal counsel filed brief and motion to advance citing incarceration.]

|  | [Prosecutor and Prosecuting Attorneys Association agreed.] |
|---|---|
| C Ap 7/10 | [Court of Appeals denied motion to advance.] |
| 7/24 | Prosecutor answered speedy trial motion. |
| 8/19 | Prosecutor's answer to speedy trial motion served on defendant. |
| C Ap 11/13 | [Court of Appeals took petition for counsel under advisement.] |

*1969*

|  |  |
|---|---|
| 4/10 | Defendant's speedy trial motion filed 6/20/68 heard 294 days after filing. |
| 4/16 | Defendant's speedy trial motion denied. |
| C Ap 4/23 | [Court of Appeals ruled trial court had erred in refusing trial counsel 161 days after case taken under advisement and 297 days after filing motion and stipulation to advance.] |
| 4/25 | Trial judge on receipt of Court of Appeals Opinion assigned counsel and gave option for trial in May or August. Assigned counsel opted for latter. |
| 6/19 | Defendant's assigned trial counsel moved to quash for denial of speedy trial. |
| 8/18 | Trial Court denied motion to quash. |
| 9/19 | Defendant moved for immediate trial and case set for October. |
| 10/15 | Defendant moved for continuance after trial court granted the Prosecution's motion to endorse additional witnesses on the information. |
| 10/17 | Trial Court grants continuance. |

*1970*

1/20    Case comes to trial 27 months after
        defendant's arrest.

1/30    Defendant convicted of murder in the
        first degree.

LEVIN, J. *(concurring)*. For different reasons, I agree with my colleagues that

—the handwriting specimens seized during the second search of Chism's home were properly obtained and admissible in evidence;

—the evidence tending to show an earlier attempt by Chism on the life of the victim was admissible.

## I

First I wish to add some additional observations regarding the speedy trial issue.

As stated in the opinion of the Court, the delay in Chism's trial was caused by the circuit judge's ruling that Chism was not entitled to be represented by a lawyer appointed at state expense and the time consumed in appealing and obtaining a reversal of that ruling.

Legitimate differences of opinion and judgment concerning questions of fact and law are bound to arise in the course of lawsuits. Appellate courts are established to resolve such differences.

Whenever a trial judge errs in ruling on a question that arises before (as here), during or after the trial of a case and the defendant seeks and obtains reversal on appeal and trial or a new trial follows, the delay in the commencement of the trial or the new trial is attributable, in a sense, to the ruling found on appeal to have been erroneous.

Sometimes, albeit infrequently, the trial which ultimately results in a defendant's affirmed conviction occurs many years after the defendant's arrest because of delay attributable to mistrials or new trials granted by the trial judge or, as here, a successful appeal.

Lawyers, judges, trial and appellate, often differ. Such differences and the time required to resolve them through the time consuming appellate process does not deny a defendant a speedy trial.

What then is a reasonable time for an appeal? Interlocutory appeals are heard on leave granted. Leave was granted on March 29, 1968, 28 days after the Court of Appeals received the prosecutor's response to the application for leave to appeal. Chism's brief was filed on May 9 and the prosecutor's on June 6. On July 1, after the Court of Appeals had concluded hearing cases until October, Chism moved for advancement on the calendar. The motion was denied on July 10. In my opinion the motion should have been granted. If it had been granted the case would have been submitted in the early part of October instead of on November 13, and the unnecessary delay of one month would have been avoided.

I am not persuaded by the contention of Chism and of the amicus that the Court of Appeals was constitutionally obliged to hear during the summer recess the appeal which it granted Chism in the exercise of discretion.

The opinion of the Court of Appeals was filed five months and ten days after the cause was submitted. At the time the average disposition time after submission was two–three months.

In summary, the unjustified delay during the interlocutory appeal was perhaps four months. A delay of that length, while unfortunate, is not, in

my opinion, so unreasonable as would justify dismissal of the prosecution, which the United States Supreme Court has recently declared is the only possible remedy. See *Strunk v United States,* 412 US 434; 93 S Ct 2260; 37 L Ed 2d 56 (1973).

## II

The opinion of the Court relies on the "totality of facts and circumstances" in upholding the admissibility of the handwriting specimens seized during the second search of Chism's home. The facts that stand out are that Chism authorized "a complete search", this authorization was given on October 11, and the papers seized on the following day during the second search had been identified during the first search conducted on the 11th.

I see no reason to read the authorization as justifying but one visit to the Chism home, particularly where what was taken on the second visit was espied on the first visit and was seized within 30 hours after the authorization to search and seize was signed.

I would limit the authority of a co-owner to authorize a search of jointly-owned property to a case where the person giving the consent is himself under suspicion and so consents in an effort to exculpate himself. This apparently was the case in *Frazier v Cupp,* 394 US 731; 89 S Ct 1420; 22 L Ed 2d 684 (1969), as there the consenting co-user of the duffel bag consented to the search at the time of his arrest.

I am guided by the following well-reasoned statement of the United States Supreme Court:

"Our decisions make clear that the rights protected by the Fourth Amendment are not to be eroded by strained applications of the law of agency or by unreal-

istic doctrines of 'apparent authority.' As this Court has said, 'it is unnecessary and ill-advised to import into the law surrounding the constitutional right to be free from unreasonable searches and seizures subtle distinctions, developed and refined by the common law in evolving the body of private property law which, more than almost any other branch of law, has been shaped by distinctions whose validity is largely historical * * * [W]e ought not to bow to them in the fair administration of the criminal law. To do so would not comport with our justly proud claim of the procedural protections accorded to those charged with crime.' *Jones v United States,* 362 US 257, 266–267 [80 S Ct 725; 4 L Ed 2d 697, 705, 706; 78 ALR2d 233 (1960)]." *Stoner v California,* 376 US 483; 84 S Ct 889; 11 L Ed 2d 856 (1964), *rehearing den* 377 US 940; 84 S Ct 1330; 12 L Ed 2d 303 [1964].

### III

In a case where it is sought to establish the identity of the murderer with circumstantial evidence,[1] evidence that the person charged as the murderer has threatened the life of the victim clearly would be admissible.[2] On the same principle, evidence is admissible that tends to show a prior attempt to murder the victim by the person charged.[3]

I agree that a failure to instruct on the limited purpose for which other crimes evidence is received is generally not error in the absence of a request to charge.

T. G. Kavanagh and M. S. Coleman, JJ., did not sit in this case.

---

[1] *Compare People v Hall,* 19 Mich App 95, 109; 172 NW2d 473 (1969).

[2] *See People v Scott,* 284 Ill 465; 120 NE 553 (1918); *Commonwealth v Moore,* 398 Pa 198; 157 A2d 65; 93 ALR2d 616 (1959); 40 Am Jur 2d, § 316, pp 586–687.

[3] *See Washington v State,* 8 Tex App 377 (1880); 40 Am Jur 2d, § 312, pp 582–583.