*If this opinion indicates that it is "FOR PUBLICATION," it is subject to revision until final publication in the Michigan Appeals Reports.*

# STATE OF MICHIGAN

# COURT OF APPEALS

PEOPLE OF THE STATE OF MICHIGAN,

        Plaintiff-Appellee,

v

DENZIEL CALVIN WILLIAMS-BOYD,

        Defendant-Appellant.

UNPUBLISHED
July 18, 2024

Nos. 364425; 364426; 364427
Genesee Circuit Court
LC Nos. 2021-047724-FH;
        2021-047725-FH;
        2021-047726-FC

Before: MARKEY, P.J., and SWARTZLE and MARIANI, JJ.

PER CURIAM.

Defendant was arrested after the fatal shooting of a female acquaintance and the shooting of her friend. Defendant faced charges in three different cases that were consolidated for a jury trial. Following trial, defendant was convicted of first-degree premeditated murder, MCL 750.316(1)(a); assault with intent to murder (AWIM), MCL 750.83; felon in possession of a firearm (felon-in-possession), MCL 750.224f; three counts of carrying a firearm during commission of a felony (felony-firearm), MCL 750.227b; carrying a concealed weapon, MCL 750.227; third-degree fleeing or eluding a police officer, MCL 750.479a(3); and two counts of resisting or assaulting a police officer, MCL 750.81d(1). Defendant appeals his convictions by right, arguing that (1) the trial court erred by denying his motion to suppress his statements made during a police interview, (2) the prosecution presented insufficient evidence of premeditation and deliberation to support his first-degree murder conviction, and (3) his trial counsel provided ineffective assistance by failing to object to the consolidation of his cases and by failing to assert his right to a speedy trial. We affirm.

## I. FACTUAL AND PROCEDURAL BACKGROUND

At approximately 2:30 a.m. on July 13, 2020, defendant fatally shot the victim and injured the victim's friend. The victim's friend testified at trial that she and the victim were very close friends and referred to each other as sisters. Earlier in the evening, the two spent several hours visiting other friends in the area. The victim subsequently messaged defendant and asked for a ride home. Defendant and the victim were acquaintances; defendant frequently socialized with

the victim online and had given her rides home multiple times in the past. The victim's friend only knew of defendant through the victim's prior interactions with him on social media. Based on the online interactions, it was clear to the victim's friend that defendant was romantically interested in the victim. Defendant agreed to the request and picked up the victim and her friend.

The victim's friend further testified that, as defendant drove them to the victim's home, defendant asked the victim how she would pay him for gas. The victim responded that she would pay him later. Upon arriving at the victim's home, defendant again asked the victim how she would pay him for gas. The victim responded that she did not have any money at that time but would give him money after she received her next paycheck. Defendant responded, "[B]itch, I said where's my money." The victim then instructed her friend to get out of defendant's car, and the victim followed suit.

The victim's friend testified that she and the victim stood on the victim's porch while defendant remained in his car, which was still parked in front of the victim's home. The victim's friend watched the victim exchange text messages with defendant for approximately 20 minutes. The exchanges escalated, and defendant eventually got out of his car and began yelling at the victim about the money. The victim repeatedly insisted that she did not have money to give him at that time and told him to leave. Defendant refused and flashed a gun that was concealed in his pocket. The victim asked defendant why he had his "strap pulled out on" her, and the victim's friend noticed that defendant was moving around a lot and appeared "skittish." Another one of the victim's friends testified that the victim had messaged her while she was arguing with defendant and stated that she was "irritated" and that there was "a gun out."

Defendant then shot the victim several times in the face and head. According to the victim's friend, defendant fired the first two shots with some pause in between and, after further pause, fired approximately four more shots "together" in rapid succession. The victim's friend saw the victim laying on the porch and bleeding from the mouth, and she screamed at defendant. Defendant then looked at her with "big eyes," and she ran away. Defendant shot at her and grazed her leg with a bullet as she did so. The victim's friend heard defendant get back into his car and squeal his tires as he left the victim's house. The victim's friend subsequently called the police to report the shooting, as did several neighbors who heard the shots.

The victim's neighbors—a father, his son, and his daughter—all testified that they called the police to report a shooting that occurred at approximately 2:30 a.m. All three testified that they heard several nearby gunshots. All three also testified that, a few seconds after the gunshots, they heard a woman scream, "[Y]ou shot my sister." The three also heard the woman tell another person to leave and that "the police [were] coming." The father testified that he also saw shadows of people moving around when he looked outside, and he believed that one of them was the woman who screamed. The son testified that he heard car tires squealing approximately three minutes after he heard the woman screaming.

A Michigan State Police (MSP) Trooper testified that, several hours after the shooting, officers located defendant driving a black Malibu. Officers pursued defendant for some time and, after initiating a traffic stop, ordered defendant out of the car. Defendant complied, but he ignored further orders to get on the ground and instead ran into a nearby wooded area. Officers searched the area for three or four hours but were unable to locate defendant.

The Trooper further testified that, on July 30, 2020, officers received an anonymous tip regarding defendant's location. Defendant immediately fled the house upon the officers' arrival, but a search by a K-9 officer uncovered defendant hiding in the detached garage. Defendant refused to comply with the officers' commands and was sprayed with pepper spray when he attempted to flee again. Defendant was then arrested and taken to the police station.

Two detectives interviewed defendant at the police station approximately two hours after his arrest.[1] Defendant was advised of his *Miranda*[2] rights, was given the waiver form to read, indicated that he understood his *Miranda* rights, and then signed the waiver form. Defendant initially denied shooting the victim and stated that he fled the victim's home after a small group of people approached and shot her after she got out of his car, but he later admitted to walking up to the victim on her porch and shooting her in the face and head because he felt upset and offended when she told him to leave. Defendant further admitted that, after shooting the victim, he walked back to his car and left. Defendant did not recall shooting at the victim's friend as she ran away. Defendant admitted to disposing of the gun after the shooting, but he could not recall where he disposed of it after he left the victim's house. An investigating officer testified that the gun used to kill the victim was ultimately never found but that all of the shell casings located at the scene of the crime were fired by the same gun.

Defendant was charged in Docket No. 364427 for the offenses related to the shooting, in Docket No. 364426 for the offenses related to the traffic stop several hours after the shooting, and in Docket No. 364425 for the offenses related to his arrest two weeks later. The prosecution moved to consolidate all three cases at a pretrial hearing, which the trial court granted. Defendant later moved to suppress his statements to the detectives, arguing that they were not made voluntarily. After conducting a *Walker*[3] hearing, the trial court denied the motion. At trial, the prosecution presented testimony from several different witnesses, including testimony from the victim's friend, other friends and neighbors, multiple forensic analysts, several investigating officers, several officers who were involved in locating and arresting defendant, and one of the detectives who interviewed defendant immediately after his arrest. The testimonial and physical evidence presented by the prosecution established defendant's identification, relationship with the victim, involvement in the victim's murder, and ownership and use of the black Malibu. Defendant presented testimony from the individual with whom the victim was messaging shortly before the shooting about there being "a gun out," and he argued that the proofs at trial did not establish his guilt beyond a reasonable doubt but instead supported the version of events he initially recounted to the detectives.

The jury convicted defendant of the offenses noted previously. In Docket No. 364427, the trial court sentenced defendant as a fourth-offense habitual offender, MCL 769.12, to life in prison for first-degree murder, a term of 750 to 2,250 months' imprisonment for AWIM, a term of 76 to 912 months' imprisonment for felon-in-possession, and a term of 2 years' imprisonment for each

---

[1] A recording of the interview was played in its entirety for the jury.

[2] *Miranda v Arizona*, 384 US 436; 86 S Ct 1602; 16 L Ed 2d 694 (1966).

[3] *People v Walker (On Rehearing)*, 374 Mich 331; 132 NW2d 87 (1965).

felony-firearm conviction. In Docket No. 364426, the trial court sentenced defendant as a fourth-offense habitual offender to a term of 48 to 144 months' imprisonment for third-degree fleeing or eluding a police officer and a term of 40 to 120 months' imprisonment for resisting or assaulting a police officer. In Docket No. 364425, the trial court sentenced defendant as a fourth-offense habitual offender to a term of 46 to 180 months' imprisonment for resisting or assaulting a police officer. Defendant's sentences in all three cases were to be served concurrently to one another but consecutively to his concurrent felony-firearm convictions. This consolidated appeal followed.[4]

## II. MOTION TO SUPPRESS STATEMENTS

Defendant argues that the trial court erred by denying his motion to suppress the statements he made during his police interrogation. Defendant argues that the statements should have been suppressed because he was likely still under the influence of drugs during the interview, which, along with his level of education and mental health issues, kept him from making his statements voluntarily. We disagree.

## A. STANDARD OF REVIEW

Defendant preserved this issue by filing a motion to suppress his statements, which, following a *Walker* hearing, the trial court denied. See *People v McCrady*, 244 Mich App 27, 29; 624 NW2d 761 (2000). We review de novo "a trial court's decision on a motion to suppress," but we review "all underlying factual findings for clear error." *People v Stewart*, 512 Mich 472, 480; 999 NW2d 717 (2023). A finding is clearly erroneous if, after reviewing the entire record, we are left with a definite and firm conviction that a mistake was made. *Id.* "[D]eference is given to the trial court's assessment of the weight of the evidence and credibility of the witnesses." *People v Shipley*, 256 Mich App 367, 373; 662 NW2d 856 (2003).

## B. ANALYSIS

"Both the United States and Michigan Constitutions protect citizens against self-incrimination and afford due process of law," and "[t]he use of an involuntary statement elicited by coercive state action in a criminal trial violates these constitutional protections." *Stewart*, 512 Mich at 480; see also US Const, Ams V and XIV; Const 1963, art 1, § 17. "[I]f an individual's will was overborne or if his confession was not the product of a rational intellect and a free will, his confession is inadmissible because it was coerced." *Stewart*, 512 Mich at 480 (quotation marks, citations, and alterations omitted). Police officers can overcome an individual's will through "both physical intimidation and psychological pressure." *Id.*

When determining whether a defendant's statements were coerced by state action, a reviewing court must determine whether the totality of the circumstances surrounding the statements demonstrate that the statements were "freely and voluntarily made." *Id.* at 481

---

[4] We consolidated these cases "to advance the efficient administration of the appellate process." *People v Williams-Boyd*, unpublished order of the Court of Appeals, entered January 11, 2023 (Docket Nos. 364425; 364426; 364427).

(quotation marks and citation omitted). Though all relevant circumstances must be considered, our Supreme Court has directed that a reviewing court must specifically consider as factors:

> the age of the accused; his lack of education or his intelligence level; the extent of his previous experience with the police; the repeated and prolonged nature of the questioning; the length of the detention of the accused before he gave the statement in question; the lack of any advice to the accused of his constitutional rights; whether there was an unnecessary delay in bringing him before a magistrate before he gave the confession; whether the accused was injured, intoxicated or drugged, or in ill health when he gave the statement; whether the accused was deprived of food, sleep, or medical attention; whether the accused was physically abused; and whether the suspect was threatened with abuse. [*Id*., quoting *People v Cipriano*, 431 Mich 315, 334; 429 NW2d 781 (1988).]

In this case, defendant moved to suppress his custodial statements on the basis that they were not made knowingly or voluntarily because of his low level of education, mental health issues, and drug use at the time of the interview. A *Walker* hearing was held to address defendant's motion to suppress, and the trial court heard testimony from the lead detective who conducted defendant's interview. The trial court also reviewed the video of the interview as well as the competency and criminal responsibility reports completed by a forensic center. After considering all of the evidence presented and the *Cipriano* factors, the trial court concluded that there was nothing to indicate that defendant's statements to the detectives were made unknowingly and involuntarily. In particular, the court found that nothing indicated that defendant's mental-health diagnoses impeded his ability to voluntarily participate in or understand the interview, emphasizing that the forensic center found defendant to be both competent and criminally responsible. The court also found that there was nothing to suggest that defendant was under the influence of drugs or alcohol at the time of the interview, despite his mentions of frequent drug and alcohol use. The court further found that defendant demonstrated a high level of intelligence and provided thoughtful responses throughout the interview.

When considering the totality of the circumstances, we disagree with defendant's claim that his custodial statements were involuntary. See *Cipriano*, 431 Mich at 333-334. Defendant was 20 years old at the time of the interview and, although he dropped out of school in eighth grade, he received a GED while incarcerated for an unrelated crime. Defendant stated that he was diagnosed with attention deficit hyperactivity disorder (ADHD), bipolar disorder, and "schizo" when he was six or seven years old and had taken prescribed medication "off and on" over the years, but he was not taking medication at the time of the interview.[5] Defendant reported that he could read and write, demonstrated a strong vocabulary and organized thinking throughout the interview, and appeared articulate and able to follow the discussion without issue. Defendant also reported that he drank alcohol and used ecstasy "almost all the time," but, when asked about his drug use that day, he stated that he had not used either substance in a few days and had only smoked marijuana earlier that day. According to the detective, defendant did not appear to be under the

---

[5] Defendant did not elaborate on exactly what diagnosis he meant when he reported that he was "schizo."

influence during the interview, which was further supported by defendant's responses and demeanor in the video recording of the interview. The interview occurred approximately two hours after his arrest around 9:00 p.m. and lasted approximately 1 hour and 20 minutes. Cf. *Stewart*, 512 Mich at 493-494 (concluding that a three-hour interrogation "was not excessively long"). Defendant's clothes had been removed prior to the interview because pepper spray still contaminated them, but he was wrapped in a blanket throughout the interview. The detective assisted defendant in washing the pepper spray off of his skin prior to the interview, and the effects of the pepper spray had worn off approximately 45 minutes after initial contact, well before the interview had occurred. Defendant denied ever being uncomfortable, injured, or sick, and there is no evidence that defendant was physically abused, was ever denied food, water, sleep, or medical attention, or was ever threatened with those things. Defendant was informed of his *Miranda* rights before the interview, and he expressly indicated to the detectives that he understood and waived those rights. There is also no evidence of improper psychological pressure by the detectives. See *id*. at 480. Although defendant expressed his wish to call his mother, there is no evidence that the detectives used that fact to coerce him into making incriminating statements.

This evidence in the record indicates that, under the totality of the circumstances in this case, defendant's custodial statements were voluntarily made in response to the detectives' interview. See *Cipriano*, 431 Mich at 333-334. We see no merit in defendant's arguments to the contrary, and no error in the trial court's denial of defendant's motion to suppress his statements. See *Stewart*, 512 Mich at 480.

## III. SUFFICIENCY OF THE EVIDENCE

Defendant argues that his conviction for first-degree murder must be reversed because the prosecution presented insufficient evidence to prove beyond a reasonable doubt that he premeditated and deliberated the killing of the victim. We disagree.

## A. STANDARD OF REVIEW

"This Court reviews a challenge to the sufficiency of the evidence by examining the record evidence de novo in the light most favorable to the prosecution to determine whether a rational trier of fact could have found that the essential elements of the crime were proved beyond a reasonable doubt." *People v Clark*, 330 Mich App 392, 436; 948 NW2d 604 (2019) (quotation marks and citation omitted). It is the trier of fact's role to determine "the weight of the evidence [and] the credibility of witnesses," and we will not interfere with that role. *People v Kanaan*, 278 Mich App 594, 619; 751 NW2d 57 (2008). "Circumstantial evidence and reasonable inferences arising therefrom may constitute proof of the elements of a crime, and it does not matter that the evidence gives rise to multiple inferences or that an inference gives rise to further inferences." *People v Walker*, 330 Mich App 378, 382; 948 NW2d 122 (2019) (quotation marks, citations, and alteration omitted).

## B. ANALYSIS

To convict a defendant of first-degree premeditated murder, the prosecution must prove beyond a reasonable doubt that the defendant intended to kill the victim and that the intent to kill was both premeditated and deliberate. *People v Bennett*, 290 Mich App 465, 472; 802 NW2d 627

(2010). "[T]o premeditate is to think about beforehand; to deliberate is to measure and evaluate the major facets of a choice or problem." *People v Oros*, 502 Mich 229, 240; 917 NW2d 559 (2018) (quotation marks and citation omitted). While "premeditation and deliberation are separate elements . . . , the same facts may tend to establish each element, and they are subjective factors usually incapable of direct proof absent an admission or confession by the defendant." *Id.* at 241. "The requisite state of mind may be inferred from [the] defendant's conduct judged in light of the circumstances." *Id*. at 243 (quotation marks and citation omitted).

"Premeditation and deliberation may be established by an interval of time between the initial homicidal thought and ultimate action, which would allow a reasonable person time to subject the nature of his or her action to a 'second look.' " *Id.* at 242 (citations omitted). "[S]ome time span between the initial homicidal intent and ultimate action is necessary to establish premeditation and deliberation, but it is within the province of the fact-finder to determine whether there was sufficient time for a reasonable person to subject his or her action to a second look." *Id*. (quotation marks and citation omitted). "While the minimum time necessary to exercise this process is incapable of exact determination, it is often said that premeditation and deliberation require only a brief moment of thought or a matter of seconds." *Id*. at 242-243 (quotation marks, citations, and alteration omitted). Premeditation and deliberation may also be established through evidence of "(1) the prior relationship of the parties; (2) the defendant's actions before the killing; (3) the circumstances of the killing itself; and (4) the defendant's conduct after the homicide." *Walker*, 330 Mich App at 384 (quotation marks and citation omitted). For example, the nature and number of a victim's wounds may be used to support a finding of premeditation and deliberation. *People v Unger*, 278 Mich App 210, 230-231; 749 NW2d 272 (2008).

The prosecution presented sufficient evidence from which a rational jury could find that defendant intentionally killed the victim with premeditation and deliberation. The victim's friend testified that defendant maintained a friendly relationship with the victim online, was romantically interested in the victim, and had given the victim rides home multiple times in the past. Defendant demanded that the victim pay him as he drove her home and remained parked in front of her house even after she told him to leave because she could not pay him at that time. Defendant continued to argue with the victim via text message for approximately 20 minutes, and he subsequently confronted her on her porch. The victim again told defendant to leave because she could not pay him at that time, to which defendant responded by flashing a concealed gun at her. The victim asked defendant why he had his "strap pulled out on" her, and the victim's friend saw defendant concealing a gun near his leg. After defendant revealed the gun, the victim messaged her other friend that she was "irritated" because a gun had been pulled on her. Defendant admitted that he shot the victim because he felt offended by her demands that he leave without payment, and the timeline of events established through the proofs at trial indicate that there was sufficient time and opportunity for defendant not only to form the intent to kill the victim, but to consider that course of action and take a "second look." See *Oros*, 502 Mich at 242-243. This is only further supported by the testimony of the victim's friend describing defendant's shot pattern as two shots with pauses in between, then another pause, then four more quick shots. When viewing this evidence in a light most favorable to the prosecution, a reasonable jury could have readily inferred from the facts and circumstances presented that defendant intended to kill the victim and did so with premeditation and deliberation. See *id*.; *Walker*, 330 Mich App at 384. See also *Clark*, 330 Mich App at 436. Therefore, there was sufficient evidence to support defendant's conviction of first-degree premeditated murder.

## IV.  INEFFECTIVE ASSISTANCE OF COUNSEL

Defendant raises two claims of ineffective assistance of counsel on appeal.  Claims of ineffective assistance of counsel present mixed questions of fact and law.  *People v Head*, 323 Mich App 526, 539; 917 NW2d 752 (2018).  Factual findings are reviewed for clear error, while questions of law are reviewed de novo.  *Id*.  "The trial court's findings are clearly erroneous if this Court is definitely and firmly convinced that the trial court made a mistake."  *People v Shaw*, 315 Mich App 668, 672; 892 NW2d 15 (2016).

"To establish ineffective assistance of counsel, a defendant must show (1) that counsel's performance fell below an objective standard of reasonableness under prevailing professional norms and (2) that there is a reasonable probability that, but for counsel's error, the result of the proceedings would have been different."  *Id*.  "A reasonable probability is a probability sufficient to undermine confidence in the outcome."  *People v Randolph*, 502 Mich 1, 9; 917 NW2d 249 (2018) (quotation marks and citation omitted).  We presume counsel was effective, and defendant carries a heavy burden to overcome this presumption.  *Head*, 323 Mich App at 539.

### A.  PERMISSIVE JOINDER

Defendant first argues that defense counsel was ineffective for failing to object to the joinder of his three cases because the cases were distinct and unrelated.  We disagree.

MCR 6.120(B) governs permissive joinder of criminal charges and authorizes a trial court to "join offenses charged in two or more informations or indictments against a single defendant" where it is "appropriate to promote fairness to the parties and a fair determination of the defendant's guilt or innocence of each offense."  Joinder is permitted when "the offenses are related."  MCR 6.120(B)(1).  "To determine whether joinder is permissible, a trial court must first find the relevant facts and then must decide whether those facts constitute 'related' offenses for which joinder is appropriate."  *People v Williams*, 483 Mich 226, 231; 769 NW2d 605 (2009).  For the purposes of the court rule, offenses are "related" if they are based on "the same conduct or transaction," "a series of connected acts," or "a series of acts constituting parts of a single scheme or plan."  MCR 6.120(B)(1)(a)-(c).  "Other relevant factors" that a trial court may consider when determining whether joinder is appropriate include "the timeliness of the motion, the drain on the parties' resources, the potential for confusion or prejudice stemming from either the number of charges or the complexity or nature of the evidence, the potential for harassment, the convenience of witnesses, and the parties' readiness for trial."  MCR 6.120(B)(2).  "[D]ecisions regarding joint or severed trials for related charges lie firmly within the discretion of trial courts."  *People v Breidenbach*, 489 Mich 1, 14; 798 NW2d 738 (2011).

In this case, defendant's murder of the victim was what led to his efforts to elude the police both several hours after the incident as well as approximately two weeks later when he was ultimately arrested.  Officers pursued defendant during these two incidents for no other reason than to investigate the victim's murder.  It necessarily follows, then, that defendant's charges of third-degree fleeing or eluding a police officer and resisting or assaulting a police officer resulted from—and were inextricably connected to—the murder.  Accordingly, as the trial court duly recognized, the events could properly be joined as "a series of connected acts" or "a series of acts constituting parts of a single scheme or plan."  MCR 6.120(B)(1)(b) and (c).  Furthermore, while defendant

claims that his homicide trial was unduly prejudiced by its joinder with the charges regarding his flight, he fails to acknowledge that evidence of his flight would have nonetheless been admissible at his homicide trial. See *People v Coleman*, 210 Mich App 1, 4; 532 NW2d 885 (1995) ("It is well established in Michigan law that evidence of flight is admissible."). As our Supreme Court has observed, "joinder of other crimes cannot prejudice the defendant more than he would have been by the admissibility of the other evidence in a separate trial." *Breidenbach*, 489 Mich at 13 (quotation marks, citations, alteration, and ellipsis omitted). Defendant has not shown that the trial court abused its discretion by joining the cases, see *id.* at 14, and counsel's "[f]ailure to raise a futile objection or advance a meritless argument does not constitute ineffective assistance of counsel," *People v Isrow*, 339 Mich App 522, 532; 984 NW2d 528 (2021). We therefore conclude that defendant has failed to show that defense counsel's performance was deficient in this respect. See *Shaw*, 315 Mich App at 672. Nor, for the reasons discussed, has he shown prejudice from any such deficiency. See *id.*

## B. SPEEDY TRIAL

Defendant also argues that defense counsel was ineffective for failing to assert his right to a speedy trial. We disagree.

A criminal defendant's right to a speedy trial is guaranteed by the United States and Michigan Constitutions, statute, and court rule. See US Const, Am VI; Const 1963, art 1, § 20; MCL 768.1; MCR 6.004(A). See also *People v Smith*, ___ Mich App ___, ___; ___ NW3d ___ (2024) (Docket No. 362114); slip op at 3. To determine whether a defendant has been denied the right to a speedy trial, a court must balance the four factors set forth in *Barker v Wingo*, 407 US 514, 530; 92 S Ct 2182; 33 L Ed 2d 101 (1972): "(1) the length of delay, (2) the reason for delay, (3) the defendant's assertion of the right, and (4) the prejudice to the defendant." *Smith*, ___ Mich App at ___; slip op at 3 (quotation marks and citation omitted). In this case, defendant asserts his speedy-trial claim in the context of his ineffective-assistance claim and acknowledges that, due to defense counsel's failure to assert the right, the "assertion" factor weighs against him. Defendant maintains, however, that, in consideration of the remaining three factors, defense counsel's failure to assert defendant's speedy-trial rights fell below an objective standard of reasonableness. See *Shaw*, 315 Mich App at 672. We disagree.

The 27-month delay between defendant's arrest and trial gave rise to a presumption of prejudice, and the burden of proof therefore shifted to the prosecution to show that there was no injury. See *People v Williams*, 475 Mich 245, 261; 716 NW2d 208 (2006) ("The time for judging whether the right to a speedy trial has been violated runs from the date of the defendant's arrest."); *Smith*, ___ Mich App at ___; slip op at 3 ("Following a delay of eighteen months or more, prejudice is presumed, and the burden shifts to the prosecution to show that there was no injury.") (quotation marks and citation omitted). That said, the principal reason for the delay—the COVID-19 pandemic and related court closings—did not weigh against the prosecution. See *Smith*, ___ Mich App at ___; slip op at 4-6.

Although defendant fails to make any mention of it in his brief, the COVID-19 pandemic and responsive emergency measures were in already full swing when defendant was arrested in July 2020. See *id*. at 4 (discussing the state of emergency and subsequent emergency procedures adopted by the Michigan Supreme Court in response to the COVID-19 pandemic). We recently

-9-

addressed a speedy-trial claim in this context in *Smith*, *id*. at 3-6.  Notably, defendant's case proceeded in the Genesee Circuit Court—the same county in which the *Smith* case proceeded.  As noted in *Smith*, *id*. at 4, "jury trials in the Genesee Circuit Court had barely occurred" in the 15 months preceding June 2021, and it is clear from the record in this case that significant trial restrictions remained in place in the Genesee Circuit Court until at least April 2022.  Indeed, at a March 15, 2022 hearing, the trial court noted, "[W]e're supposed to start hopefully having no restrictions on trials, I don't want to jinx us, beginning of April.  So I'm hoping that maybe we can try this case sometime this summer."  As we explained in *Smith*, "delays caused by the COVID-19 pandemic are not attributable to the prosecution for purposes of a speedy-trial claim" because "delays resulting from emergency public-health measures during an unprecedented global pandemic" are not "*inherent* in the court system" and "neither unexplained nor inexcusable."  *Id*. at 5.  It is clear that, for nearly all of defendant's case, the Genesee County courts were still working through a significant backlog of criminal cases that were much older than defendant's and still awaiting trial.  See, e.g., *id*. at 4-6.

In addition, defendant was responsible for approximately seven months of the delay between his arrest and trial.  Following his arrest, defendant raised mental-health concerns and was subsequently referred for competency and criminal responsibility evaluations, which resulted in a four-month delay.  Defendant's motion to suppress and request for a *Walker* hearing resulted in a two-and-a-half-month delay, and his subsequent allegations of ineffective assistance resulted in a nine-day delay.[6]  In sum, then, the delay in defendant's trial resulted either from actions attributable to defendant himself or from the COVID-19 pandemic and "the well-established impact it had on the ability to hold trials in the Genesee Circuit Court," which is not attributable to the prosecution.  *Id*. at 6.  The reasons for delay therefore do not support defendant's speedy-trial claim.

Lastly, we consider whether defendant suffered any prejudice.  "There are two types of prejudice which a defendant may experience, that is, prejudice to his person and prejudice to his defense."  *Id*. at 6 (quotation marks and citation omitted).  "In considering the prejudice to the defendant, the most serious inquiry is whether the delay has impaired the defendant's defense." *People v Simpson*, 207 Mich App 560, 564; 526 NW2d 33 (1994).  Defendant argues that he suffered prejudice to his person because he suffered from mental anxiety during his pretrial incarceration, which we do not dispute, but "anxiety alone cannot establish a speedy-trial violation."  *Smith*, ___ Mich App at ___; slip op at 6.  Beyond this, defendant does not present any specific allegation or proof of any identifiable prejudice to his defense, and we therefore cannot conclude that defendant suffered any prejudice to his defense.  See *People v Chism*, 390 Mich 104, 115; 211 NW2d 193 (1973) ("[O]n the matter of prejudice to [the] defendant because of the length of time before his trial, the most important thing is that there is no evidence that a fair trial was jeopardized by delay, although obviously 27 months of incarceration is not an insignificant personal hardship.").

In sum, when balancing all of the relevant factors, defendant has not established that his speedy-trial rights were violated.  Given that the delay was either beyond the court's control or

---

[6] Defendant ultimately decided to proceed to trial with his appointed attorney.

attributable to defendant and that defendant has not shown prejudice to his defense from it, defense counsel's assertion of defendant's speedy-trial rights would have been futile, and counsel is not ineffective for failing to raise a futile objection or meritless argument. See *Isrow*, 339 Mich App at 532.

Affirmed.

/s/ Jane E. Markey
/s/ Brock A. Swartzle
/s/ Philip P. Mariani